UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| SATISH SHAH, THE SATISH SHAH REVOCABLE TRUST, AMISH SHAH DEBRA ANN SHAH, ROBERT E. THEROUX, DANIEL L. WILLIAMS AND FREDERICK BACHMAN<br><br>Plaintiffs,<br>v.<br><br>KIK INTERNATIONAL LLC<br><br>Defendant. | Case No. 3:06-CV-0712-RM |

## DECLARATION OF LOUIS G. DUDNEY, CPA UNDER 28 U.S.C. §1746

I, Louis G. Dudney, having been duly sworn, do hereby depose and state as follows:

I.   **Personal Background**

1.   The statements set forth in this Declaration are based on my personal knowledge acquired from a review of the documents referenced herein and/or attached hereto, including the November 27, 2006 Declaration of Marilee K. Hopkins Under 28 U.S.C. §1746 ("Hopkins Declaration"), and from other sources.

2.   I am a managing director of AlixPartners, LLP, based in its Chicago, Illinois office. Before joining AlixPartners in January 2000, I was a partner in the Financial Advisory Services Group of PricewaterhouseCoopers.

1

3.  I have a Bachelor of Business Administration degree in Accounting from the College of William and Mary in Williamsburg, Virginia. I am a Certified Public Accountant licensed in Illinois.

4.  I have over 18 years experience with respect to merger and acquisition transactions and disputes, the accounting for such transactions, as well as the damages associated with such disputes. Exhibit I contains a copy of my curriculum vitae.

5.  I have been retained by Kirkland & Ellis LLP, counsel for KIK International LLC ("KIK"),to provide expert opinions regarding the indemnification claims (the "Indemnity Claims") set forth in the arbitration demand that KIK filed with the American Arbitration Association ("AAA") in Chicago on or about September 20, 2006 (the "Arbitration Demand"), a copy of which (without exhibits) is appended to plaintiffs' complaint as Exhibit No. 3.

6.  The opinions expressed herein are based on my investigation and the evidence available to date. If called upon to testify as to the matters addressed herein, I could do so competently.

## II.  The Structure Of The Transaction At Issue

7.  KIK and the plaintiffs in this lawsuit (the "Sellers") entered into a written stock purchase agreement (the "SPA"), effective as of September 19, 2005, pursuant to which KIK purchased all of the outstanding shares of APG, Inc. (the "Company") from the Sellers.[1]

8.  The sale of the APG shares from the Sellers to KIK pursuant to the SPA (the "Transaction") closed on October 21, 2005.[2]

---

[1] Compl. ¶ 1 & Ex. 1 thereto.
[2] Compl. ¶ 2.

### A. The Purchase Price Is Tied To The Company's Normalized FY2005 EBITDA.

9. As is typical for transactions like this one, the parties appear to have determined the price that KIK was to pay Sellers for the Company by reference to the Company's cash flow for the fiscal year ending September 30, 2005 ("FY2005") and to the working capital needed to produce that cash flow.[3]

10. Specifically, the parties originally agreed that the price KIK would pay the Sellers for their shares of the Company would be approximately six and one-half times the Company's earnings before interest, taxes, depreciation and amortization ("EBITDA") for FY2005.[4] EBITDA is a measure of the operating cash flow of a business.[5]

11. Application of EBITDA multiples enables an entity to compute an estimate of a company's present value of future cash flows or enterprise value. When a company's value is determined through the use of an EBITDA multiple, as was the case in this Transaction, any misstatement of the EBITDA has a many fold effect on the purchase price, in this case a six and one-half times effect.

12. Because Sellers originally represented that the Company's actual and projected EBITDA for FY2005 was approximately $12 million, KIK originally offered to pay six and one-half times that amount, or $78 million, for the APG shares.[6] However, prior to entering into the SPA, KIK insisted on a downward adjustment of the purchase price by $5 million to account for

---

[3] Compl., Ex. 3 (Arbitration Demand) ¶¶ 22-62.
[4] Compl., Ex. 3 (Arbitration Demand) ¶ 23.
[5] By removing interest, taxes, depreciation and amortization, EBITDA removes the effects of non-operating activities such as financing and investing and, therefore, is an indicator of the profitability of the underlying business.
[6] Compl., Ex. 3 (Arbitration Demand) ¶ 23. *See also* August 26, 2005 letter from KIK Customs Products Limited to APG, Inc., Satish Shah, on behalf of APG, Inc. and the shareholders of APG, Inc. and the related attachment.

3

the projected loss of approximately $800,000 in annual EBITDA that was expected to result from the Company's then ongoing renegotiation of a customer contract.[7]

13.    Thus, according to § 2.1 of the SPA, the total cash consideration paid by KIK to Sellers at closing for the Company was equal to: (i) $73.0 million (the "Purchase Price"); less (ii) the "Reduction Items"[8] and (iii) the "Escrowed Funds" ($9.0 million).[9]

### B.    The Purchase Price Is To Be Adjusted For Working Capital Shortfalls At Closing.

14.    Because working capital is used to sustain a business and, therefore, to generate cash flows, the parties to the SPA further agreed that as of the close of the sale of the APG shares, the Company would have working capital of $24 million (the "Target Net Working Capital" or "Target"), and, if the closing working capital was less than the Target, then the price that KIK paid for the APG shares would be reduced by one dollar for each dollar that the closing working capital was below the Target.[10]

15.    As to the specific working capital adjustment provisions of the SPA, it is my understanding that § 2.2 provides for a downward adjustment to the Purchase Price if the working capital of the Company as of the October 21, 2005 date of closing -- the so-called "Closing Date Net Working Capital" -- is less than the Target (which the SPA refers to as the "Target Net Working Capital").[11]

---

[7] Compl., Ex. 3 (Arbitration Demand) ¶ 44.
[8] Reduction Items are defined in the Agreement as Company Indebtedness as of the Closing Date including, but not limited to the Kem Krest Debt, the City of Elkhart IRB referred to in Schedule 2.1 of the Agreement, capitalized lease obligations, indebtedness of borrowed money, debt related expenses, guarantees of indebtedness, indebtedness due to stockholders, employee bonuses described on Schedule 3.19 of the Agreement, any unpaid Sellers' Costs described in § 11.5 of the SPA and net of any bank cash balances, marketable securities and sinking fund reserves as of the Closing Date. Compl., Ex. 1 (SPA) at 55 § 11.8(mm). "Escrowed Funds" are defined simply as $9 million of the $73 million that was deposited into escrow at closing. Id. at 2 § 2.1.
[9] Compl., Ex. 1 (SPA) at 2 § 2.1.
[10] Compl., Ex. 1 (SPA) at 2-4 § 2.2.
[11] Compl., Ex. 1 (SPA) at 3 § 2.2(d).

16. Further, the Closing Date Net Working Capital is determined by reference to the Company's "Closing Date Balance Sheet and Schedule" -- which is agreed upon by the parties, and, to the extent they do not agree, is determined by Ernst & Young pursuant to a truncated and expeditious dispute resolution process prescribed by SPA § 2.2(c) (the "WCDRP") that does not permit Ernst & Young to undertake any "independent review" but merely requires it to adopt Sellers' or KIK's position with respect to each dispute put before it for resolution and further requires it to apply certain accounting conventions set forth in Schedule 11.8 of the SPA.[12]

17. In my experience, such working capital adjustment provisions are mechanisms that are intended to address changes in working capital resulting from business operations during the brief period of time that generally ends on the date the buyer takes ownership of the business, in this case October 21, 2005.

18. Customarily, this type of adjustment is not meant to and does not correct for any misrepresentations affecting the calculation of EBITDA that may be the basis for the pricing of the transaction.

### III. The Relationship Of The Transaction's Structure To Asserted Breaches Of Representations, Warranties, And/Or Covenants

19. Thus, in light of the foregoing, and as is typical in such transactions, in agreeing in the SPA to acquire the Company from the Sellers for the Purchase Price of $73 million, KIK was purchasing both: (1) the present value of the future cash flows of the Company, calculated by multiplying the Company's normalized EBITDA for FY2005 by six and one-half times; and (2) the Target amount of working capital that the Company needed to generate such cash flows.

---

[12] Compl., Ex. 1 (SPA) at 3 § 2.2(c); Compl., Ex. 2 (Sched. 11.8).

20. Given the foregoing structure of the Transaction, if Sellers breached representations, warranties, and/or covenants in the SPA that resulted in an overstatement of the EBITDA generated by the Company for the twelve months ending September 30, 2005 (an "EBITDA Overstatement"), then those breaches would result in the price for the Company being overstated by six and one-half times the EBITDA Overstatement, but they would not necessarily affect the amount of working capital that the Company had on the October 21, 2005 closing date.

21. Conversely, if Sellers breached representations, warranties, and/or covenants in the SPA that resulted in an overstatement of the closing working capital of the Company (a "WC Overstatement"), then those breaches would result in the price for the Company being overstated by the amount of the WC Overstatement (assuming, as was the case here, that the overstated working capital was nonetheless below the Target), but they would not necessarily affect the amount of EBITDA that the Company generated for the twelve months ending September 30, 2005.[13]

22. Finally, as a consequence of the foregoing structure of the Transaction, if Sellers' breaches of representations, warranties, and/or covenants in the SPA result in both an EBITDA Overstatement and a WC Overstatement, then to be appropriately compensated for the harm caused by both Overstatements, the Purchase Price of the Company should be reduced by six and one-half times the amount of the EBITDA Overstatement and by an additional amount equal to the WC Overstatement. That is because in the event of such breaches, KIK receives neither the

---

[13] In my experience, in a typical transaction like this one, it is not customary for proof of such a breach to be required in order to establish a party's entitlement to an adjustment of the purchase price because the closing working capital is below the amount of closing working capital that is prescribed by the parties' agreement. This is because shortfalls in closing working capital can be caused not only by breaches of representations, warranties, and/or covenants, but also by late customer payments and other developments over which the contracting parties have no control and that occur after the parties sign a purchase agreement but before a closing on the transaction occurs.

6

bargained-for cash flow, nor the bargained-for closing working capital required to produce that cash flow.

23. The Hopkins Declaration ignores these fundamental and typical features of the Transaction at issue here.[14] In my opinion, in doing so, Ms. Hopkins erroneously asserts that compensation for a WC Overstatement caused by Sellers' breach of a representation, warranty, and/or covenant is also compensation for an EBITDA Overstatement caused by the same breach.[15] This is incorrect. For the reasons set forth above, a WC Overstatement and an EBITDA Overstatement are separate and discrete injuries, and therefore separate and unique redress for each of these discrete injuries cannot be considered double (or greater) recovery for the same injury, even if the same conduct produces both injuries.

## IV.   KIK's Indemnity Claims

24. I understand that prior to execution of the SPA, Sellers supplied unaudited financial statements and projections supporting the FY2005 EBITDA to be used in the computation of the Purchase Price.[16] The unaudited financial statements included actual EBITDA as calculated by the Company for the 10-month period ended July 31, 2005 ("Unaudited Financial Statements" or "UFS"),[17] and a projection for the two-month period ended September 30, 2005. I further understand that Sellers supplied further financial statements to KIK subsequent to execution of the SPA but prior to the closing of the Transaction that

---

[14] Hopkins Decl. ¶¶ 1-30.
[15] Hopkins Decl. ¶¶ 8-25.
[16] Compl., Ex. 3 (Arbitration Demand) ¶¶ 26-27.
[17] The UFS were purported by the Sellers to fairly represent the financial condition and results of operation for APG for the first 10 months of FY2005 (for the time period from October 1, 2004 through July 31, 2005). Specifically, the Sellers represented and warranted in SPA § 3.8 that the UFS fairly presented the financial condition of APG as of July 31, 2005, that they fairly presented the results of APG as of July 31, 2005, that (with certain exceptions not relevant here) they had been prepared in accordance with GAAP as consistently applied by APG, and that none of the UFS were materially misstated. Compl., Ex. 1 (SPA) at 7 § 3.8.

purported to represent the actual EBITDA of the Company for the months of August and September 2005.[18]

25.     Section 8.3 of the SPA states that the Sellers shall indemnify KIK for any losses caused by Sellers' breach of any representation, warranty, and/or covenant in the SPA.[19]

26.     Each of the Indemnity Claims filed by KIK in the AAA arbitration expressly requests indemnification under SPA § 8.3 for Sellers' breaches of representations, warranties, and/or covenants, and most further assert that such breaches resulted in an EBITDA Overstatement.[20]

## V.     Comparison Of KIK's Indemnity Claims And Sellers' Working Capital Claims

27.     Significant differences exist between the Indemnity Claims asserted by KIK in the AAA arbitration in Chicago, and Sellers' working capital disputes (the "Working Capital Claims") that are currently ripe for submission to Ernst & Young pursuant to the WCDRP prescribed by SPA § 2.2. They are:

(a)     The Indemnity Claims and Working Capital Claims relate to different components of the amount of consideration paid by KIK for the Company;

(b)     Some of the Indemnity Claims relate to disputes regarding the Company's income statement as of the ten months ending July 31, 2005, and/or as of the twelve months ending September 30, 2005, whereas the Working Capital Claims all relate to disputes regarding the Company's balance sheet on a single day, October 21, 2005; and

(c)     The Indemnity Claims and Working Capital Claims appear to be governed by different sections of the Agreement. The Indemnity Claims are governed by § 8.3 of the SPA,

---

[18] Compl., Ex. 3 (Arbitration Demand) ¶¶ 45-46, 59-62.
[19] Compl., Ex. 1 (SPA) at 39-41 § 8.3.
[20] Compl., Ex. 3 (Arbitration Demand) ¶¶ 67 - 112.

the representations set forth in Article 3 of the SPA (which do not reference Schedule 11.8), and the covenants set forth in Article 7 of the SPA, whereas the Working Capital Claims are governed by § 2.2 of the SPA and Schedule 11.8 to the SPA.[21]

### A. Indemnity Claims In Count I Of The Arbitration Demand.

28. Count I of the Arbitration Demand states that KIK has a claim for indemnity against the Sellers based on material breaches of the Sellers' representations and warranties regarding the Unaudited Financial Statements for the Company that were appended to the Agreement as Attachment 3.8(b) to Schedule 3.8.[22]

29. This Indemnity Claim further asserts that Sellers' breaches of these representations and warranties resulted in an EBITDA Overstatement, specifically:

(a) The failure to appropriately reserve for obsolete inventory. Given this allegation, the underaccrual of obsolete or excess inventory, in contravention of generally accepted accounting principles, would result in an understatement of the cost of goods sold ("COGS") in the UFS, and an overstatement of EBITDA for the ten months ending July 31, 2005. Accordingly, the COGS would have to be increased and EBITDA for the first ten months of FY2005 would have to be decreased.[23]

(b) The failure to appropriately accrue self-insured costs. Given this allegation, the failure to accrue for self-insured costs in the UFS would be a violation of GAAP that results in an overstatement of EBITDA for the first ten months of FY2005. In addition, had Sellers appropriately accrued for and disclosed these self-insured costs in the UFS, then such

---

[21] Compl., Ex. 1 (SPA); Compl., Ex. 2 (Sched. 11.8).
[22] Compl., Ex. 3 (Arbitration Demand) ¶¶ 67-79.
[23] Compl., Ex. 3 (Arbitration Demand) ¶¶ 71-73.

9

monthly anticipated costs for the remaining two months of FY2005 also would have to be reduced from the FY2005 EBITDA used to price the transaction.[24]

(c) A Kem Krest account receivable entry of approximately $150,000 for which supporting documentation may not exist. Given this allegation, an actual sale of goods or billable services would not have occurred. The unsupported Kem Krest account receivable in the amount of $150,000 therefore would reflect an overstatement of accounts receivable and revenue. Accordingly, revenue and EBITDA for the ten months ending July 31, 2005 would have to be adjusted downward by $150,000.[25]

(d) A special billing accrual of approximately $130,000 for which supporting documentation may not exist. Given this allegation, an actual sale of goods or billable services would not have occurred. The unsupported special billing accrual of approximately $130,000 therefore would reflect an overstatement of accounts receivable and revenue. Accordingly, revenue and EBITDA for the ten months ending July 31, 2005 would have to be adjusted downward by $130,000.[26]

(e) A $120,000 vendor rebate that APG treated as income instead of as a reduction to the cost of inventory, as required by GAAP. Given this allegation, the treatment of a $120,000 vendor rebate as income instead of a reduction to the COGS as inventory is sold would result in a $120,000 overstatement of EBITDA for the ten months ending July 31, 2005.[27]

(f) The failure to adequately accrue bad debt expense in the amount of $60,000 for certain accounts receivable on APG's books as of July 31, 2005. Given this allegation, this would reflect an understatement of expense in the UFS. Accordingly, expenses

---

[24] Compl., Ex. 3 (Arbitration Demand) ¶¶ 74-75.
[25] Compl., Ex. 3 (Arbitration Demand) ¶ 76(a).
[26] Compl., Ex. 3 (Arbitration Demand) ¶ 76(b).
[27] Compl., Ex. 3 (Arbitration Demand) ¶ 76(c).

10

would be increased by $60,000 and EBITDA for the ten months ending July 31, 2005 would have to be adjusted downward by $60,000.[28]

(g) A purported $57,000 sale to Procter & Gamble that has not been billed or collected, for which supporting documentation may not exist. Given this allegation, an actual sale of goods or billable services would not have occurred. The unsupported Procter & Gamble account receivable in the amount of $57,000 would reflect an overstatement of accounts receivable and revenue for the ten months ending July 31, 2005. Accordingly, revenue and EBITDA for that period would have to be adjusted downward by $57,000.[29]

(h) A $32,000 overstatement of accounts receivable in the UFS as compared to the accounts receivable listed on APG's general ledger. Given this allegation, the $32,000 overstatement of accounts receivable in the UFS as compared to accounts receivable listed on APG's general ledger would reflect an overstatement of accounts receivable and revenue as of July 31, 2005. Accordingly, revenue and EBITDA would have to be adjusted downward by $32,000.[30]

(i) A failure to accrue in the UFS on a monthly basis for $24,000 in leasing expenses. Given this allegation, the failure to accrue $24,000 in monthly leasing expenses would reflect an understatement in expenses for the ten months ending July 31, 2005. Accordingly, expenses would be increased by $24,000 and EBITDA would have to be adjusted downward by $24,000.[31]

30. In summary, I understand these Indemnity Claims were brought because KIK believes that the UFS was not fairly prepared and presented in accordance with GAAP and

---

[28] Compl., Ex. 3 (Arbitration Demand) ¶ 76(d).
[29] Compl., Ex. 3 (Arbitration Demand) ¶ 76(e).
[30] Compl., Ex. 3 (Arbitration Demand) ¶ 76(f).
[31] Compl., Ex. 3 (Arbitration Demand) ¶ 76(g).

contained material misstatements. Given these allegations, the improper accounting treatment would cause revenues to be overstated and expenses to be understated for the first 10 months of FY2005. These revenues and expenses both affect the income statement and, by definition, EBITDA for the same period.

31. Therefore, based upon the aforementioned allegations, there is no potential for duplication of the damage awards between the Indemnity Claims and Working Capital Claims. Despite Ms. Hopkins' belief that the Claims are duplicative, the outcome and subsequent award in WCDRP does not have an impact on the outcome and subsequent award of damages in the AAA arbitration since, among other things, I understand that the WCDRP is based upon the October 21, 2005 balance sheet of the Company and the foregoing Indemnity Claims relate to the income statement for the 10 months ending July 31, 2005 and the unaudited financial information for the period ending September 30, 2005. Each of the items presented in subparagraphs 29(a) through 29(i) cause misstatements of the income statements resulting in the overstatement of EBITDA used to compute the Purchase Price. Consequently, KIK was damaged by the collective amount of the EBITDA Overstatement, multiplied times 6.5.

### B. Indemnity Claims In Count II Of The Arbitration Demand.

32. Count II of the Arbitration Demand states that Sellers breached the SPA by failing to conduct its business with Connetics in the ordinary course and by failing to disclose a "material change ... in the purchases, orders, buying patterns, payment practices, or, to Seller's Knowledge, the financial condition or prospects of any customer of the Acquired Companies, except as disclosed on Schedule 3.19."[32]

33. Based upon KIK's allegations in the Arbitration Demand, the Sellers' actions resulted in:

---

[32]Compl., Ex. 3 (Arbitration Demand) ¶¶ 81-97; Compl., Ex. 1 (SPA) at 18-19 § 3.19 (r).

12

(a)     The acceleration of sales into FY2005 that ordinarily would not have occurred until the subsequent fiscal year; and

(b)     A FY2005 EBITDA that, as a result, did not accurately reflect the Company's normalized cash flow for FY2005.[33]

34.     Had KIK been made aware of the impending slowdown of sales to Connetics in FY2006, it could have obtained a downward adjustment to the Purchase Price (as it did with another customer contract that it learned during due diligence was being renegotiated) and/or KIK could have obtained an adjustment to normalize EBITDA by excluding the sales to Connetics that were accelerated into FY2005, thereby reducing the Purchase Price by approximately 6.5 times the amount of EBITDA generated by the accelerated sales.[34]

35.     Further, I find nothing in Hopkins' Declaration or the materials appended thereto that suggests that Sellers have any Working Capital Claim or that there is otherwise currently any working capital dispute pertaining to the Connetics sales put at issue by this Indemnity Claim.  Therefore, Ms. Hopkins' Declaration does not assert that this Indemnity Claim is duplicative of any Working Capital Claim; she instead merely asserts that because the conduct put at issue by this Indemnity Claim also would affect the closing working capital of the Company, that KIK should be required to submit it to E&Y for determination as part of the WCDRP.[35]  However, I find no support for such assertions in Ms. Hopkins' Declaration, and, to do as she suggests would, for the reasons set forth above, deprive KIK of any compensation for the EBITDA Overstatement caused by Sellers' breaches of representations and warranties relating to this Claim -- although I do agree with Ms. Hopkins that KIK also should receive compensation in the WCDRP for the WC Overstatement such breaches caused, if any.

---

[33] Compl., Ex. 3 (Arbitration Demand) ¶¶ 81-96.
[34] Compl., Ex. 3 (Arbitration Demand) ¶ 95.
[35] Hopkins Decl. ¶ 26.

### C. Indemnity Claims In Count III Of Arbitration Demand.

36. Count III of the Arbitration Demand states that the Sellers failed to disclose three issues related to a distribution center that was under construction at the time of KIK's acquisition of the Company, including: (1) cost overruns associated with an automated palletizing system that was being installed; (2) construction cost overruns associated with the warehouse for the new distribution center; and (3) unbudgeted software licensing costs associated with an inventory control and management software package that was needed for the new distribution center.[36]

37. Count III of the Arbitration Demand further states that had Sellers disclosed these issues, as they covenanted that they would do, then KIK would have obtained a side agreement at closing to have any such overruns indemnified by Sellers -- as the parties did with similar issues that were brought to KIK's attention after the SPA was signed but prior to closing of the Transaction.[37] Further, since these one-time cost overruns in FY2006 would not be expected to affect the normalized EBITDA of the Company, KIK does *not* seek damages for this Indemnity Claim in the amount of 6.5 times the amount of undisclosed cost overruns.[38] And, because the liability for such cost overruns would contractually have been the responsibility of Sellers, they would not have been properly recorded as current liabilities of the *Company* as of October 21, 2005 that would affect the closing working capital of the Company.

---

[36]Compl., Ex. 3 (Arbitration Demand) ¶¶ 99-111.
[37]Compl., Ex. 3 (Arbitration Demand) ¶ 110.
[38]Compl., Ex. 3 (Arbitration Demand) ¶ 111.

Pursuant to 28 U.S.C. § 1746 and under the penalty of perjury, I declare that the foregoing is true and correct.

FURTHER DECLARANT SAYETH NOT.

_____
Louis G. Dudney, CPA

December 15, 2006

# EXHIBIT 1


*Change the outcome.*

## CURRICULUM VITAE
## OF
## LOUIS G. DUDNEY, CPA

| | |
|---|---|
| **POSITION** | Managing Director, Financial Advisory Services Practice, Co-Head of Case Management Services Practice, AlixPartners, LLP |
| **EDUCATION** | College of William and Mary, B.B.A. in Accounting |
| **PROFESSIONAL CERTIFICATIONS/ BUSINESS AFFILIATIONS** | Certified Public Accountant - Illinois<br>American Institute of Certified Public Accountants<br>Illinois Society of Certified Public Accountants<br>Member - Licensing Executives Society, American Bankruptcy Institute, Turnaround Management Association |
| **RANGE OF EXPERIENCE** | Mr. Dudney's experience covers broad types of transaction, litigation, valuation, bankruptcy and management consulting engagements, including mergers & acquisitions, intellectual property valuation and dispute resolution, breach of contract and lost profits analysis, insurance dispute resolution, environmental claim analysis, and accounting treatment dispute analysis. Prior to joining AlixPartners, LLP, Mr. Dudney was a partner with PricewaterhouseCoopers in its Financial Advisory Services Group. Mr. Dudney has consulted with companies in a number of industries including retail, telecommunications, food services, specialty chemicals, real estate, financial services, entertainment, manufacturing, construction, energy and consumer products. In performing engagements in these industries, Mr. Dudney has analyzed accounting, economic and financial issues and testified in Federal, Civil, Bankruptcy and State Courts as well as American Arbitration Association hearings and state regulatory proceedings as an expert witness. |
| **SELECTED ENGAGEMENTS** | • As part of a post acquisition purchase price dispute, retained by a Fortune 500 electrical equipment manufacturer to analyze a variety of accounting issues for both working capital adjustment and fraud claims. As part of this assignment, analyses of accounts receivable, accounts payable, inventory, revenue and EBITDA were performed. |

181 W. Madison Street | Suite 4700 | Chicago, IL | 60602 | 312.346.2500 | 312.346.2585 fax | www.alixpartners.com



**LOUIS G. DUDNEY, CPA**
Page 2

**SELECTED ENGAGEMENTS (Continued)**

- As part of a post acquisition working capital and indemnification negotiation, assisted a large international manufacturer of aluminum engines in analyzing its pre and post closing accounting treatment of various items and assembled the Company's submission of its reimbursement claim.

- On behalf of a snack food manufacturing and distribution business, retained to advise the Company and the Private Equity sponsors in evaluating various accounting based working capital and indemnification claims to be made as part of an agreed to arbitration process. As part of this analysis, over 20 potential claims were analyzed to determine the impact to working capital and EBITDA of various accounting treatments.

- In a post acquisition purchase price dispute, retained by a safety products company to analyze the impact to working capital, EBITDA, and the purchase price paid as a result of a variety of accounting restatements.

- As part of a post acquisition purchase price and earn-out dispute, retained by an international health care insurance and billing company to analyze the accounting treatment and related claims made with respect to certain contractual purchase price adjustments clauses. As part of this assignment, analyses of bad debt expense, EBITDA, revenue recognition, and other accounting issues were conducted.

- As part of a post acquisition working capital and purchase price dispute, retained by a food preparation company to analyze its trade promotion and sales allowance accounting practices. As part of this assignment, assisted the company in negotiations regarding the proposed working capital adjustment. Additionally, provided an analysis of accounting, internal control and process weaknesses to the company.

- In a leveraged buyout transaction that resulted in litigation, analyzed the consideration and associated deal terms of the original transaction and developed a valuation of the subject company assuming the deal was unwound.



AlixPartners LLP
Change the outcome.

**LOUIS G. DUDNEY, CPA**
Page 3

**SELECTED ENGAGEMENTS (Continued)**

- In a venture capital transaction, determined the damages associated with fraudulent financial information provided prior to the sale of a software company. This required analysis of corporate financial statements, independent accountants' workpapers and other financial disclosures.

- As part of a post acquisition purchase price dispute, retained by a furniture manufacturer to evaluate the Company's working capital claim and calculate the normalized EBITDA of the Company as of the transaction closing date. As part of this analysis, various accounting treatments of revenue and expense items were evaluated.

- For a real estate limited partnership, retained to opine on a HUD audit of operations, cash flows and transactions related to inappropriate payments between identity-of-interest companies and the Management Agent. This analysis included reviews of compliance audits and analyses of transactions between several layers of limited partnerships.

- In a post acquisition purchase price and breach of contract dispute, valued the equity of an international health and fitness business.

- For a value added reseller of advanced machining technology, retained to advise the company regarding valuation and deal structuring issues related to the potential sale of the company.

- Retained by a joint venture vehicle manufacturer to analyze its historical allocation of overhead and labor costs related to a dispute over the selection and proper use of budgets, standards and allocation methodologies.

- Retained by a national distributor and rebuilder of machine tools to analyze its operations and financial status related to downturns in its performance. As part of this assignment, assisted the Company by evaluating its percentage of completion accounting procedures, reviewing its inventory capitalization policies and implementing improvements to properly recognize revenue. Additionally, assisted the Company in negotiations with its lenders resulting in additional financing being provided.



AlixPartners LLP
| Change the outcome.

**LOUIS G. DUDNEY, CPA**
<u>Page 4</u>

**SELECTED ENGAGEMENTS (Continued)**

- Retained by a large electrical contractor to analyze its operations, review the status of its projects, cost overruns and claims. As part of this assignment, analyses of individual construction contracts were conducted to determine the appropriateness of the Company's accounting under the percentage of completion method. Additionally, determined the financial status of claims, project profitability and future expected cash outflows.

- For a caisson and foundation building company, retained by the bank group in a workout to analyze the status of various ongoing construction projects and document and trace the flow of funds for selected transactions between numerous operating entities. This assignment included analyses of financial reporting, intercompany transactions, bank account activity, investment transactions and payments to third parties.

- Retained by a food distribution company to reconstruct financial records for several years to determine the amounts due by several former customers. This analysis included tracing the flow of funds between numerous entities and analyzing disputed transactions.