UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| SATISH SHAH, THE SATISH SHAH REVOCABLE TRUST, AMISH SHAH, DEBRA ANN SHAH, ROBERT E. THEROUX, DANIEL L. WILLIAMS and FREDERICK H. BACHMAN<br><br>      Plaintiffs,<br><br>v.<br><br>KIK INTERNATIONAL LLC,<br><br>      Defendant. | **CASE NO. 3:06-CV-0712 RM**<br><br>**Chief Judge Robert L. Miller, Jr., Presiding**<br><br>**Magistrate Judge Christopher A. Neuchterlein** |

**DEFENDANT'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS**

Defendant KIK International LLC ("KIK"), for its FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS to plaintiffs' COMPLAINT TO COMPEL ARBITRATION OF NET WORKING CAPITAL ADJUSTMENT, AND TO STAY A DUPLICATIVE ARBITRATION CASE, states as follows:

1.      KIK International LLC ("KIK"), non-party APG, and the Plaintiffs are parties to a Stock Purchase Agreement ("SPA"), dated September 19, 2005, which sets forth the terms of KIK's purchase of all of the issued and outstanding shares of stock of APG from the Plaintiffs, collectively referred to in this Complaint as the "Former Shareholders."

**ANSWER**:  Admitted.

2.      The sale of APG stock, under the terms of the SPA, closed on October 21, 2005.

**ANSWER**:  Admitted.

3.      KIK is a Delaware limited liability company, whose principal office is located in Toronto, Ontario, Canada.

**ANSWER**:  Admitted.

4.      Plaintiffs Satish Shah and Debra Ann Shah are residents and citizens of Florida.

**ANSWER**:  KIK is without information sufficient to admit or deny the allegations in paragraph 4, although, on information and belief, it admits that Plaintiffs Satish Shah and Debra Ann Shah are residents and citizens of either Florida or Indiana.

5.      Plaintiff Satish Shah is the sole trustee of The Satish Shah Revocable Trust, which for purposes of this Court's diversity jurisdiction is a citizen of Florida.

**ANSWER**:  KIK is without information sufficient to admit or deny the allegations in paragraph 5, although, on information and belief, it admits that the Trust is a resident and citizen of either Florida or Indiana.

6.      Plaintiffs Amish Shah, Robert E. Theroux, Daniel L. Williams and Frederick H. Bachman are residents and citizens of Indiana.

**ANSWER**:  Admitted.

7.      Under the SPA, a copy of which is attached (without all the schedules) as Exhibit No. 1, any action or proceeding arising out of or relating to the SPA shall be subject to the jurisdiction of the federal court for the Northern District of Indiana. (SPA § 11.13, p. 58).

**ANSWER**:  Denied.

8.      Jurisdiction over the subject matter of this action exists under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Former Shareholders and KIK, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER**:  KIK denies that there is a justiciable controversy with respect to Count I of Plaintiffs' complaint, and KIK further denies that the Court has jurisdiction over KIK's arbitrable claims for indemnification.  KIK admits that the parties are of diverse citizenship and that its arbitrable indemnification claims exceed $75,000, exclusive of interests and costs.  KIK denies the remaining allegations of paragraph 8, if any.

9.      Venue is proper in the federal court for the Northern District of Indiana, and

under the SPA the parties have agreed to waive any defense of inconvenient forum.

(SPA § 11.13)

**ANSWER**:  KIK denies that this is the proper venue for Count II as that Count seeks to
enjoin an arbitration proceeding in Chicago, Illinois.  KIK further denies that the proper venue
for its arbitrable indemnification claims is the Northern District of Indiana.  KIK further denies
that there is any justiciable controversy with respect to Count I and therefore denies that venue
for such claim is proper in any tribunal.  KIK denies the remaining allegations of paragraph 9, if
any.

10.      Venue in the Northern District of Indiana and the South Bend Division is proper

under 28 U.S.C. §1391 and 28 U.S.C. §94(a)(2), because a substantial part of the events or

omissions giving rise to this Complaint occurred in Elkhart County, Indiana.

**ANSWER**:  Denied as to Plaintiffs' claims for the reasons set forth in the answer to
paragraph 9.

## COUNT I: COMPLAINT TO COMPEL ARBITRATION

11.      The SPA provides for the escrow of a portion of the Purchase Price pending a

final determination of the Closing Date Balance Sheet and Closing Schedule, under the *Net*

*Working Capital Adjustment* provisions of the SPA (§ 2.2., pp. 2-3).  More than $3 million

remains in escrow. (*See* SPA § 2.4., pp. 4-5)

**ANSWER**:  Admit the second sentence of paragraph 11.  Denied as to the first sentence
of paragraph 11 insofar as it paraphrases, characterizes, and/or summarizes the terms of the SPA
in a manner inconsistent with the express terms of the SPA, and the associated escrow
agreement, which make clear that the escrowed funds cannot and will not be released until KIK's
indemnification claims are resolved, and which further makes clear that unless KIK is found to
be entitled to less on its indemnity claims than the amount of escrowed funds, then all such
escrowed funds properly are payable to KIK.

12.      The escrowed funds are to remain in escrow only until such time as the parties

agree on APG's Closing Date Balance Sheet and Closing Schedule, or until there is a final

determination made by the "Accountants" as defined by the SPA. This determination permits the

release of the $3 million from escrow, less any Actual Deficit between the Target Net Working Capital ($24 million) and the Closing Date Net Working Capital. (*See* SPA §§ 2.2(c), 2.4(b)(i), l1.8(c) and (rr), pp. 3-4, 50, 56)

**ANSWER**:  Denied.  SPA § 2.4(b)(i) states that only if the sum of any working capital deficit *and* "the aggregate amount of any Buyer's Release Requests on account of Indemnity Claims" are less than $3 million will Plaintiffs be entitled to release of any escrowed funds following the final determination of the Closing Date Net Working Capital.  The remaining allegations of paragraph 12 are denied as legal conclusions belied by the express terms of the SPA paragraph 12 purports to interpret.

13.     The SPA designates Ernst & Young as the "Accountants" which are to resolve disputes between the parties relating to the Net Working Capital Adjustment. (*See* SPA, §§ 2.2 and 11.8(a), pp. 2-3, 50)

**ANSWER**:  Admitted.

14.     Because the parties cannot agree on a Closing Date Balance Sheet and Closing Schedule or how much of the escrowed funds are payable to the Former Shareholders, the Former Shareholders seek to compel resolution of this dispute, by the accounting firm of Ernst & Young, as required by the *Net Working Capital Adjustment* provisions of the SPA (§ 2.2., pp. 2-3) (the "Working Capital Arbitration").

**ANSWER**:  KIK admits that the parties do not agree on a Closing Date Balance Sheet and Closing Schedule, and therefore there is no agreement among the parties as to the release of any escrowed funds.  KIK denies the remaining allegations in paragraph 14.

15.     Resolutions of disputes are to be determined based solely on the standards set forth in the SPA, including the accounting principles described on Schedule 11.8 to the SPA. (*See* SPA, §§ 2.2(c), p. 3; and Schedule 11.8) A copy of Schedule 11.8 is attached as Exhibit No. 2.

**ANSWER**:  Denied insofar as paragraph 15 seeks to paraphrase, characterize, or summarize the terms of the SPA in a manner inconsistent with the express terms of the SPA. KIK denies the remaining allegations in paragraph 15 because they are legal conclusions

respecting the interpretation and effect of provisions of the SPA that are belied by the language of the SPA itself and by applicable legal authority.

16. The dispute resolution procedure required by the *Net Working Capital Adjustment* provisions of the SPA is "arbitration in everything but name." *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 7 (1st Cir. 2004). *See also Omni Tech Corp. v. MPC Solutions Sales, LLC*, 432 F.3d 797 (7th Cir. 2005).

**ANSWER**:  KIK denies the legal conclusion set forth in paragraph 16 and notes the inclusion of citations to legal authorities is in derogation of Rule 8 of the Federal Rules of Civil Procedure.  Insofar as any further response is required, KIK denies the remaining allegations of paragraph 16.

17. The Former Shareholders and KIK have not been able to agree on the amount of the Net Working Capital Adjustment.

**ANSWER**:  Admitted.

18. By letter dated August 30, 2006, counsel for the Former Shareholders sent a proposal to counsel for KIK, outlining a procedure for resolution of the dispute by Ernst & Young, a proposed letter to the managing partner of Ernst & Young, and a proposed engagement letter by which the parties would jointly engage Ernst & Young to resolve the dispute in accordance with the applicable provisions of the SPA.

**ANSWER**:  Admitted except said letter suggests that the Former Shareholders simultaneously transmitted such letter and proposal to an auditor at the offices of Ernst & Young in Indianapolis, Indiana without conferring in advance with KIK as to its agreement to proceed in that venue, without discussing any of the particulars in the letter and the proposed engagement, and without first responding to a settlement proposal made by KIK nearly two months before for resolution of the parties' working capital disputes.

19. Instead of responding to the proposal, on September 20, 2006, KIK filed a Demand for Arbitration with the American Arbitration Association (the "AAA"), claiming the Former Shareholders committed fraud and breached the SPA's warranties (the "AAA

Arbitration"). A copy of the Demand for Arbitration, without the voluminous exhibits, is attached as Exhibit No. 3.

**ANSWER**:  KIK admits filing a Demand for Arbitration with the American Arbitration Association ("AAA") on September 20, 2006.  KIK further notes that the Former Shareholders violated the confidentiality rules pertaining to AAA arbitrations by filing KIK's confidential arbitration demand with the instant lawsuit.  KIK denies that the arbitration demand it filed with the AAA on September 20, 2006 was, or purported to be, a response to the referenced letter of August 30, 2006.  KIK denies the remaining allegations of paragraph 19, if any.

20.    The subject matter of the AAA Arbitration is substantially interwoven into the fabric of the Net Working Capital Adjustment, effectively making the proceedings duplicative. KIK's claims asserted under Articles 8 and 9 of the SPA seek to "end run" the Net Working Capital Adjustment provisions of the SPA.

**ANSWER**:  Denied.

21.    Rather than responding to the proposal, KIK also caused APG to terminate the employment of Plaintiffs Satish Shah, Robert E. Theroux and Frederick H. Bachman.

**ANSWER**:  Denied.

22.    KIK seeks to delay the Working Capital Arbitration.  KIK takes the position, articulated in a letter from counsel, that it sees no "benefit to [the Former Shareholders] in proceeding with the working capital ADR process at this juncture, and therefore, [it sees] no benefit to the parties in spending substantial sums to resolve their working capital disputes now."

**ANSWER**:  Denied as to sentence one of paragraph 22.  Admitted that KIK's position is that proceeding with working capital adjustment process at this juncture is a waste of time and money for both parties, but denied that KIK has on such grounds refused to proceed with the working capital adjustment process.  Denied as to any remaining allegations of paragraph 22.

23.    By its delay, and actions taken contrary to the provisions of the SPA, KIK has failed and neglected to arbitrate the Net Working Capital Adjustment as required by the terms of the SPA.

**ANSWER**:  Denied.

24.     Accordingly, the Former Shareholders ask this Court to compel KIK to participate in the Working Capital Arbitration, as required by the SPA, without further delay.

**ANSWER**:  Denied that the Former Shareholders are entitled to any relief.

25.     The Former Shareholders are entitled to an order directing that the Working Capital Arbitration proceed in the manner provided for in the SPA, under the Federal Arbitration Act, 9 U.S.C. § 4.

**ANSWER**:  Denied.

26.     This Court has the authority to declare that the Former Shareholders and KIK are obligated to participate in alternative dispute resolution as set forth in the SPA, under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

**ANSWER**:  Denied.

## COUNT II: STAY OF AAA ARBITRATION

27.     The Former Shareholders restate the allegations of Paragraphs 1 through 26.

**ANSWER**:  KIK incorporates its responses to allegations 1 through 26 above as if fully set forth herein.

28.     KIK commenced the AAA Arbitration under the SPA catch-all provision for the resolution of "indemnification" claims. (*See* SPA § 11.13, p. 58)

**ANSWER**:  KIK admits that it commenced the AAA Arbitration under the SPA's arbitration provisions, but denies the remaining allegations in paragraph 28.

29.     In the AAA Arbitration, KIK states four counts against the Former Shareholders, the first three identified as "indemnity" claims, and the fourth identified as a "fraud" claim.

**ANSWER**:  Denied.  KIK's arbitrable indemnity claims are asserted against each of the Former Shareholders, whereas KIK's fraud claim was asserted against only some of the Former Shareholders.  Further, on November 9, 2006, KIK advised the AAA in writing that it was withdrawing its fraud claim given the Former Shareholders' objections to arbitrating the same.

7

30.     The AAA Arbitration's "fraud" claim is improper, because the parties never

agreed to arbitrate fraud claims.  Such claims are outside the scope of the SPA's limited

arbitration provision.

**ANSWER**:  Denied as to assertion that the "fraud" claim is improper.  KIK admits that it included a fraud claim in confidential AAA Arbitration out of regard for the Former Shareholders' putative interest in maintaining the confidentiality of such claims, but, prior to the filing of this lawsuit, KIK's counsel offered to withdraw the claim from arbitration and re-file it with a court of competent jurisdiction if the Former Shareholders were unwilling to arbitrate the same.  KIK denies the remaining allegations of paragraph 30.

31.     The AAA Arbitration should be stayed pending the resolution of the Working

Capital Arbitration, because the "indemnification" claims raised in the AAA Arbitration

duplicate arguments and protests which will be asserted by KIK in the Working Capital

Arbitration under §§2.2(b)(ii) and (c) of the SPA.

**ANSWER**:  Denied.

32.     If both arbitrations were to proceed simultaneously, the same issues and

arguments will be made twice, before two separate arbitrators, wasting the resources of the

parties and the arbitrators.  Further, the potential for inconsistent results from the two arbitrations

would make the implementation of two decisions impossible, bringing the parties to court for a

resolution--a result the parties intended to avoid by the inclusion of arbitration clauses in the

SPA.  Finally, the two arbitrations could result in double recovery for one party and double

damages for another.

**ANSWER**:  Denied.

33.     Arbitration of the disputed issues through the Working Capital Arbitration is

consistent with the intent of the parties to the SPA. The SPA provided for Ernst & Young, an

accounting firm, to decide the effect of the parties' disputes on the final Net Working Capital calculation, because accountants are most qualified to make these determinations.

**ANSWER**:  Denied.

34.    KIK's allegations in the AAA Arbitration must be presented in the manner prescribed in Article 2 of the SPA, which sets forth extensive procedural guidelines for the resolution of these disputes.

**ANSWER**:  Denied.

35.    KIK's reliance on the "catch-all" provision at the end of SPA Section 11.13, which allows for arbitration of indemnification claims with the American Arbitration Association, is misplaced, in light of the more specific procedural guidelines set forth in SPA Article 2.

**ANSWER**:  Denied.

36.    The Former Shareholders are entitled to an order staying the AAA Arbitration under the Federal Arbitration Act, and/or IND. CODE § 34-57-2-3.

**ANSWER**:  Denied.

<u>**AFFIRMATIVE AND OTHER DEFENSES**</u>

I.    Count I of Plaintiffs' Complaint fails to state a justiciable controversy, as KIK has not refused to proceed with the working capital adjustment process provided for by Article 2 of the SPA.

II.    Count II of Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

III.    The SPA bars Count II of Plaintiffs' Complaint.

IV.    The decision as to the effect, if any, that the working capital adjustment process has on KIK's indemnity claims is one that should and must be made by the arbitrators presiding

over the AAA Arbitration, not the Court, and therefore the Court is without jurisdiction over Count II of Plaintiffs' Complaint.

V.      The working capital disputes are different from KIK's indemnity claims, they involve different time periods, seek different damages, are to be decided according to different standards, and are properly brought pursuant to different provisions of the SPA before different decisionmakers.

VI.     Plaintiffs' requests for equitable injunctive relief are barred by Plaintiffs' unclean hands.

VII.    Count II is improperly venued in a district other than the district in which the arbitration is proceeding.

VIII.   KIK reserves the right to assert further and additional affirmative defenses as and when information becomes available to KIK supporting the same.

## AMENDED COUNTERCLAIMS

Defendant/Counterclaim Plaintiff KIK International LLC ("KIK") brings these amended counterclaims ("Counterclaims") against Plaintiffs/Counterclaim Defendants Satish Shah, the Satish Shah Revocable Trust, Robert E. Theroux, and Frederick H. Bachman (collectively, the "Counterclaim Defendants"), stating in support of the same the following:

### Nature Of The Counterclaims

1.      These Counterclaims arise out of KIK's purchase of a packaging business -- *i.e.*, APG, Inc. ("APG") -- from the former shareholders of APG (the "Former Shareholders") in the fall of 2005 for the cash price of approximately $73 million (the "Transaction").

2.      KIK agreed to pay $73 million for APG based, *inter alia*, on representations that APG had generated and would generate in the fiscal year ending September 30, 2005

("FY2005") approximately $12 million in earnings before interest, taxes, depreciation and amortization ("EBITDA").

3.      Unfortunately, after closing on the acquisition of APG on October 21, 2005, KIK discovered that in fact, the FY2005 EBITDA of APG was millions less than Counterclaim Defendants had represented and that many other representations given and made by the Counterclaim Defendants to KIK in connection with the Transaction were in fact false.

4.      Further, KIK has recently discovered contemporaneous documents and subsequent to closing has learned other information that makes it clear that: (a) Counterclaim Defendants knew that at least some of the representations given to KIK to induce it to acquire APG for a price of $73 million were false when made; (b) Counterclaim Defendants intended for KIK to rely on these intentionally false and misleading representations; and (c) Counterclaim Defendants intentionally and affirmatively took steps to conceal the true financial performance and condition of APG and to omit material information from their obligatory disclosures to KIK -- all so as to inflate the price paid for APG, thereby enlarging the amount that each of the Counterclaim Defendants received from KIK for his or its shares of APG.

5.      Therefore, KIK brings its first three Counterclaims to obtain relief for the Counterclaim Defendants' fraudulent misrepresentations, concealment, and omissions that are actionable under: (1) the applicable common law respecting fraud claims (Count I); (2) Rule 10b-5 of the Federal Securities and Exchange Act (Count II); and (3) the Indiana Crime Victim's Relief Act ("ICVRA"; Count III).

6.      While the full extent of KIK's losses has not yet been ascertained, KIK currently believes that it is entitled to recover from Counterclaim Defendants in excess of $8 million in compensatory damages on its first three Counterclaims -- exclusive of KIK's attorneys' fees, costs, and expenses (all of which it also is entitled to recover from Counterclaim Defendants under applicable federal securities laws and ICVRA), and which amounts are in addition to the

$12 million in indemnity to which KIK is entitled and that it is pursuing in an arbitration that KIK has filed against the Former Shareholders and that is currently pending with the American Arbitration Association in Chicago, Illinois. KIK also is entitled to recover punitive damages on its fraud claims based on Counterclaim Defendants' malicious, oppressive, tortious and fraudulent conduct, as further detailed below, in an amount to be determined by the finder of fact.

7.     KIK further brings its final two Counterclaims to obtain declaratory relief pursuant to 28 U.S.C. § 2201 respecting its disputed termination for cause of the employment agreements of Counterclaim Defendants Bachman and Theroux.

## Parties

8.     Non-party APG is an Indiana corporation whose principal place of business is located in Elkhart, Indiana.

9.     At all relevant times, APG has been engaged in the business of contract manufacturing, packaging, and/or distribution of aerosol and liquid fill products.

10.     At all relevant times, APG's wholly-owned subsidiaries have included, *inter alia*, Accra-Pac, Inc. ("Accra-Pac") and Kem Krest Corporation ("Kem Krest").

11.     Counterclaim Plaintiff KIK is a Delaware limited liability company, headquartered in the greater metropolitan area of Toronto, Canada, specifically, in Concord, Ontario.

12.     In October 2005, pursuant to a stock purchase agreement ("SPA") entered into on September 19, 2005, KIK purchased all of the issued and outstanding stock of APG (the "APG Shares") from the Former Shareholders.

13.     On information and belief, Counterclaim Defendant Satish Shah ("Satish") is a citizen and resident of Florida or Indiana. Prior to KIK's acquisition of APG, Satish, in his

individual capacity, owned 43.44% of the APG Shares, he was a director of APG, he was the president and chief executive officer ("CEO") of APG, and he also was a director and the CEO of both Accra-Pac and Kem Krest.

14.     On information and belief, Counterclaim Defendant the Satish Shah Revocable Trust (the "Trust") is a citizen and resident of Florida or Indiana insofar as it has legal citizenship or residence independent of that of its trustee, Satish.  Prior to KIK's acquisition of APG, the Trust owned 33.26% of the APG Shares.  On information and belief, at all relevant times, the Trust's sole trustee is and has been Satish.  As the sole trustee, Satish is exclusively liable for the Trust's obligations, and his knowledge, actions and representations are imputed to the Trust.

15.     Thus, prior to KIK's acquisition of APG, Satish, individually and as sole trustee of the Trust, controlled 76.7% of the APG Shares.  Also, pursuant to the SPA, Satish is the exclusive representative of the Former Shareholders, and, as such "Sellers' Representative," Satish has the exclusive right to bring any claims on behalf of the Former Shareholders against KIK.  Further, references to "Sellers' Knowledge" in the SPA include the "actual knowledge" of Satish, as well as the knowledge he "would reasonably be expected to have after making reasonable inquiries in the circumstances."

16.     Counterclaim Defendant Robert E. Theroux ("Theroux") is a citizen and resident of Indiana.  Prior to KIK's acquisition of APG, Theroux owned 4.5% of the APG Shares.  In addition, prior to KIK's acquisition of APG, Theroux was Accra-Pac's president and chief operating officer.  Further, references to "Sellers' Knowledge" in the SPA include the "actual knowledge" of Theroux, as well as the knowledge he "would reasonably be expected to have after making reasonable inquiries in the circumstances."

17. Counterclaim Defendant Frederick H. Bachman ("Bachman")is a citizen and resident of Indiana. Prior to KIK's acquisition of APG, Bachman owned 2.75% of the APG Shares. In addition, prior to KIK's acquisition of APG, Bachman was APG's chief financial officer ("CFO") and assistant secretary, as well as the CFO and assistant secretary of both Accra-Pac and Kem Krest. Bachman also signed the SPA on behalf of APG. Further, references to "Sellers' Knowledge" in the SPA include the "actual knowledge" of Bachman, as well as the knowledge he "would reasonably be expected to have after making reasonable inquiries in the circumstances."

## Jurisdiction & Venue

18. This Court has jurisdiction over the subject matter of Count II of the Counterclaims pursuant to 28 U.S.C. § 1331, because that claim arises under the laws of the United States.

19. This Court has jurisdiction over the subject matter of Counts I, III, IV, and V of the Counterclaims pursuant to 28 U.S.C. § 1332, because as to each such Count, the opposing parties are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorney's fees.

20. This Court also has supplemental jurisdiction over the subject matter of Counts I, III, IV, and V of the Counterclaims pursuant to 28 U.S.C. § 1367, because they are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

21. As to Counts I, II, and III of the Counterclaims, venue in this district is proper pursuant to SPA § 11.13, and it also is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these Counterclaims occurred in this district.

22.     As to Counts IV and V of the Counterclaims, venue in this district is proper pursuant to the employment agreements at issue and 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these Counterclaims occurred in this district.

23.     The Court has personal jurisdiction over each of the Counterclaim Defendants because each has consented to the jurisdiction of the Court in SPA § 11.13 and/or the employment agreements at issue, each resides or owns (or owned at the relevant time) real property in this judicial district, and jurisdiction over the same exists pursuant to the federal securities laws and/or Indiana's long-arm statute.

<u>**Initial Pricing Of The Transaction**</u>

24.     On or about Friday, August 26, 2005, KIK and Satish (on behalf of APG and the Former Shareholders) entered into a letter agreement (the "August 26 Letter") pursuant to which KIK was granted the option to make a definitive offer to acquire the APG Shares from the Former Shareholders for the cash price of $78 million.

25.     As reflected in an attachment to the August 26 Letter, the $78 million purchase price for the APG shares was arrived at by multiplying the approximate actual and projected EBITDA for APG for FY2005 (*i.e.*, $12 million) by a multiple of 6.5X (the "Multiple").

26.     As of the date that the August 26 Letter was signed, actual financial results for APG for the entire months of August and September 2005 were not available.

27.     Therefore, the FY2005 EBITDA used in initially computing the $78 million purchase price was based on 10 months of actual results (*i.e.*, October 2004 through July 2005), plus two months of projected results (*i.e.*, August and September 2005) -- the collective total of which was approximately $12 million according to the representations of Bachman, Satish, and Counterclaim Defendants' investment banker, Crowe Capital ("Crowe"), an affiliate of Crowe Chizek, the outside auditor for APG prior to the closing.

28.     More particularly, on information and belief, at the direction of Satish and with the agreement of Theroux, on or about August 25, 2005 Bachman and Crowe provided KIK with the first set of financial statements for APG (hereafter, the "Initial Financial Statements" or "IFS").

29.     These IFS represented that through the month of July 2005, actual FY2005 EBITDA for APG was approximately $10,082,000 -- which, as KIK later discovered and as is described with greater particularity below-- was false, and apparently intentionally so, as the actual FY2005 EBITDA for APG through the month of July 2005 was more than $1 million less. In addition, the IFS projected EBITDA for the four-week month of fiscal August 2005 of $821,000, and for the five-week month of fiscal September 2005 of $1,291,000.

30.     While KIK asked Satish, Bachman, and Crowe for APG's actual financial results for the first three weeks of August 2005 before signing the August 26 Letter, so that KIK could assess the reliability of Counterclaim Defendants' EBITDA projections for the months of August and September 2005, Bachman and Crowe, with the knowledge and agreement of Satish and Theroux, falsely represented to KIK that actual financial results for the first three weeks of August 2005 were not available. Further, Bachman and Crowe, with the knowledge and agreement of Satish and Theroux, falsely represented to KIK that the IFS projections for the months of August and September 2005 were the best, most accurate, and only projections then available to APG.

31.     As KIK discovered recently, however, Counterclaim Defendants' representations that financial results for the first three weeks of August 2005 were not available as of August 25, 2005, and their representations that KIK was being provided with the best, most accurate, and

only projections then available to APG for the months of August and September 2005, were intentionally false and misleading.

32.     In fact, on August 25, 2005 -- the same day that the IFS were provided to KIK and the day before the August 26 Letter was signed -- Bachman circulated an email to at least Satish and Theroux with APG financial statements for the first three weeks of August 2005 (the "Partial August Financials" or "PAFs").  APG financial personnel have subsequently confirmed for KIK that the results reflected in the PAF were in fact actual results for the first three weeks of August 2005, as the email states, and not merely projections of results for those weeks.

33.     As reflected in the PAFs, APG's actual results for the first three weeks of August 2005 (75% of that fiscal month) were in fact available *before* KIK signed the August 26 Letter. Moreover, these PAFs indicated that EBITDA for the month likely would be substantially below the projected $821,000 that APG represented to KIK was the best projection for August 2005 then available to the Former Shareholders and APG.

34.     Specifically, these PAFs indicate that only $208,000 of EBITDA was generated by APG during the first three weeks of August -- some $613,000 less than the projected monthly total provided to KIK.  These PAFs further indicated that as of August 25, 2005, APG had in its possession other projections for the month of August 2005 indicating that the month would yield a total of only $647,000 of EBITDA -- more than 20% below the projected amount provided to KIK by the Former Shareholders.  Finally, and notably, these PAFs indicated that only 3% of the sales to APG customer Connetics had been made as of the conclusion of the third week of August 2005 -- projected sales that, for the reasons set forth below, Satish, Theroux, and Bachman each knew would not be met.

35.     Thus, at the same time that Bachman and Crowe (with the knowledge and agreement of Satish and Theroux) were representing to KIK that the best and only available projections for August 2005 indicated that APG would achieve EBITDA for the month of $821,000, each of the Counterclaim Defendants: (a) *knew* that APG had realized only $208,000 of EBITDA in the first three weeks of August; (b) *knew* that APG would have to earn an additional $613,000 of EBITDA in the final fiscal week of August 2005 in order to achieve the projection provided to KIK; (c) *knew* that the projected sales to Connetics would not materialize in the final week of August 2005; and (d) *knew* that APG had in its possession other EBITDA projections for the month that were more than 20% lower than the projections that were provided to KIK and represented to be the best and only projections then available to APG.

36.     In other words, while each of the Counterclaim Defendants knew that APG would have to earn 300% more EBITDA in the final week of August 2005 than it had collectively earned in the first three weeks of August 2005 in order to meet the projected results, and while each of the Counterclaim Defendants knew that the final week of August 2005 would have to be almost 600% better than the best week of August 2005 to date in order to meet the projected results, each of the Counterclaim Defendants kept this material information from KIK, each himself or through Crowe misrepresented to KIK that it was unavailable, and each himself or through Crowe misrepresented to KIK that the best, most accurate, and only projections then available to APG showed the Company generating $821,000 of EBITDA for August 2005.

37.     Each of the Counterclaim Defendants withheld and fraudulently concealed the existence of the PAFs from KIK because each knew that his disclosure of the same to KIK would have resulted in a downward adjustment of the purchase price by $6.50 for each $1.0 of

EBITDA that was removed from the FY2005 total, thereby reducing the amount that each Counterclaim Defendant would receive from KIK for his APG Shares.

38.     Indeed, if KIK had been provided with the PAFs that were intentionally and wrongfully withheld from it, then KIK would not have initially agreed that the FY2005 EBITDA to be used in computing the purchase price should be $12 million.  Instead, KIK would have insisted that the FY2005 EBITDA figure be adjusted downward by $6.50 for each $1.0 of EBITDA that was removed from the FY2005 total.

### Due Diligence

39.     Because they understood that if KIK discovered APG's declining financial performance KIK would insist on a substantial downward adjustment of the purchase price, Satish and the other Counterclaim Defendants, through their counsel and Crowe, pressured KIK to complete its due diligence on an accelerated basis.

40.     Indeed, Satish and Counterclaim Defendants counsel and Crowe Chizek initially insisted that KIK complete all due diligence and present a binding all-cash $78 million offer on or before September 7, 2005 (only twelve days after the August 26 Letter was signed), and Counterclaim Defendants only begrudgingly thereafter extended the time to enter into a binding final agreement by a few  additional days.

41.     Counterclaim Defendants insistence on such a limited period of time for completing due diligence was ***not*** based on any genuine concern for or need to resume negotiations with another party with whom they had previously been discussing a sale, which is the pretextual reason that their counsel communicated to KIK for needing to accelerate due diligence.

42.     Indeed, as KIK learned only after it had signed the SPA and only because a lawsuit was filed by the prior party (*i.e.*, Onyx) negotiating with Counterclaim Defendants to purchase a majority interest in APG, only two days after KIK signed the August 26 Letter and before KIK even began its due diligence, Counterclaim Defendants' counsel, at the direction and with the agreement of the Counterclaim Defendants, wrote to Onyx and advised it that the Former Shareholders were no longer interested in selling a majority interest in APG to Onyx.

43.     Moreover, as KIK learned only after it had signed a binding agreement to purchase the APG Shares, the $78 million enterprise value that KIK had originally ascribed to APG was nearly $20 million higher than the enterprise value that Onyx previously had ascribed to APG.

44.     Thus, the Counterclaim Defendants insisted on restricting KIK's time for due diligence: (a) so as to minimize the chance that KIK would discover Counterclaim Defendants' knowing and intentional misrepresentations respecting the financial condition, performance, and operations of APG; and (b) so that a binding agreement would be signed by the parties before APG's financial statements for all of FY2005 became available in October 2005.

45.     On Monday, August 29, 2005, KIK and its consultants commenced intensive and accelerated due diligence.

46.     As a result of this due diligence, *inter alia,* KIK insisted that the price for the APG Shares be adjusted downward by approximately $5 million to address the anticipated loss of approximately $800,000 of annualized future earnings resulting from the ongoing renegotiation of a key customer contract addressed to the production of Febreze (the "Febreze Contract").

**KIK Is Concerned By APG's August Financials,**
**But Counterclaim Defendants' Reaffirm $12M Of FY2005 EBITDA**

47.    Finally, after repeated requests for the same, on Tuesday, September 13, 2005, less than a week before the parties were to sign a binding agreement respecting KIK's purchase of the APG Shares from the Former Shareholders, Bachman, at the direction of Satish and with the agreement of Theroux, emailed APG's August 2005 financial statements (the "August Financial Statements" or "AFS") to KIK.

48.    These AFS represented that APG had generated $789,000 of EBITDA for August 2005, meaning that APG had miraculously generated some $581,000 of EBITDA in the final week of that month. As set forth with greater particularity below, however, as KIK discovered after closing on the purchase of the APG Shares, the actual EBITDA for August 2005 was substantially less than the amount reflected in the AFS.

49.    Concerned nonetheless by the significant drop in earnings relative to the projections provided less than three weeks before that was reflected in the AFS, KIK discussed the matter with Bachman, Satish, and Crowe over the following two days.

50.    However, by email on Thursday afternoon, September 15, 2005 -- less than two business days before the SPA was to be signed, and a mere two weeks before FY2005 would be concluded -- Bachman reaffirmed (with the knowledge and agreement of Satish, Theroux, and their agent, Crowe Capital) that APG and Counterclaim Defendants were continuing to expect and project EBITDA for FY2005 in excess of $12 million. In addition, subsequent to providing the AFS to KIK, Bachman and Crowe (with the knowledge and agreement of Theroux and Satish) repeatedly falsely represented to KIK that the forecast sales for August 2005 that did not

ship in August 2005 (and that were responsible for the shortfall in August 2005 EBITDA relative to Counterclaim Defendants' projections) had in fact been shipped and/or would be shipped in September 2005.

51.     At this late juncture, KIK had no adequate or meaningful opportunity or ability to investigate further the Counterclaim Defendants' representations in this regard or to independently verify and audit the accuracy of the numbers in the AFS before signing the SPA.

52.     Moreover, notwithstanding the representations in Bachman's September 15, 2005 email, the day before Bachman sent that email he circulated to Satish and Theroux by email (but not to KIK) the financial statements for the first two weeks of fiscal September 2005 (the "Partial September Financials" or "PSFs").  APG financial personnel have subsequently confirmed for KIK that the results reflected in the PSF were in fact actual results for the first two weeks of September 2005, as the email states, and not merely projections of results for those weeks.

53.     These PSFs indicated that only $181,000 of the projected $1,291,000 of EBITDA for the month had been realized through the first two weeks of September -- making it exceedingly unlikely that the represented EBITDA for September 2005 would be met, or that the $12 million of EBITDA for FY2005 would in fact be achieved.

54.     Moreover, as reflected in these PSFs, of the projected $352,000 in sales to Connetics for the month, no sales to Connetics had been made as of the start of the third week of September.  And, as discussed below, each of the Counterclaim Defendants knew as of this date that no sales to Connetics would materialize in the remaining weeks of September given documentation and other requirements that would first have to be met before such sales could ship and the revenue associated with them could be recognized by APG.

55.     Based on Counterclaim Defendants' reassurances and representations, on September 19, 2005, KIK entered into the SPA with the Former Shareholders to acquire the APG Shares from the Former Shareholders for the price of $73 million, subject to certain post-closing adjustments.

56.     The day after the SPA was signed, September 20, 2005, Bachman again circulated to at least Satish and Theroux (but again did not provide to KIK) the financial results for APG for the first three weeks of September 2005 (the "Second Partial September Financials" or "SPSFs").  APG financial personnel have subsequently confirmed for KIK that the results reflected in the SPSFs were in fact actual results for the first three weeks of September 2005, as the email states, and not merely projections of results for those weeks.

57.     These SPSFs indicated that only $524,000 of the projected $1,291,000 of EBITDA for the month had been realized through the first three weeks of September 2005 -- further confirming that it was exceedingly unlikely that actual results for September would come anywhere close to the projected results provided to KIK.  In other words, as of September 20, 2005, each of the Counterclaim Defendants knew that $767,000 of EBITDA would have to be earned in the balance of September 2005 -- more than double the highest weekly total from the prior weeks of that month -- in order to meet the projected EBITDA of $1,291,000 provided to KIK and reaffirmed in writing only five days earlier by Bachman.

58.     Notwithstanding this, however, the Counterclaim Defendants concealed from and failed and refused to disclose to KIK any of this financial information respecting the declining performance of APG.

59.     Moreover, on September 22, 2005, Bachman sent an email to, *inter alia*, Theroux and Satish, as well as their Crowe investment bankers and auditor, estimating the proceeds that each of the Former Shareholders would receive from the sale of the APG shares to KIK. Notably, in this email Bachman stated that he believed funds escrowed in connection with the sale of the APG Shares would be reduced by approximately $1 million because, *inter alia*, he believed that there were "[i]nventory issues beyond reserves," indicating that reserves were understated by approximately $500,000. Further, Bachman stated that the projected distribution of proceeds attached to the email "[i]n my mind, [] is best case as I am nervous about the working capital and related bank loan assumptions."

60.     Once again, despite a contractual obligation on the part of each to do so, each of the Counterclaim Defendants concealed from and failed and refused to disclose to KIK any of this financial information respecting the understated inventory reserves of APG.

61.     Following the completion of the month of September 2005, KIK repeatedly requested from Counterclaim Defendants and Crowe that it be provided with APG's financial statements for September 2005 and FY2005, but Bachman and Crowe repeatedly advised that they were not available.

62.     Finally, on or about October 18, 2005 -- three days before the scheduled close of the sale of the APG Shares to KIK -- Bachman and Crowe, with the knowledge and agreement of Satish and Theroux, provided KIK with APG's financial statements for the month of September 2005 and FY2005 (the "September Financial Statements" or "SFS").

63.     These SFS represented that APG had somehow generated EBITDA for September 2005 that was close to the total Counterclaim Defendants had earlier represented to KIK would

be achieved.  In fact, however, a substantial amount of such EBITDA was attributable to invoices first created in October 2005 (*i.e.*, **after** the close of FY2005), but which income was nevertheless wrongly booked in September 2005 in derogation of generally accepted accounting principles ("GAAP") and APG's established revenue recognition policies.  Further, the FY2005 statements intentionally misrepresented that FY2005 EBITDA was some $12,201,000 (as compared to the $12,194,000 presented to KIK in August 2005).  In fact, however, as detailed below, APG generated millions less of EBITDA for FY2005 as compared to the amounts misrepresented in these FY2005 financial statements.

64.     When KIK asked about these numbers at a meeting in Elkhart on the eve of closing, Bachman, with the knowledge and agreement of Satish and Theroux, represented that there were a number of purported year-end and other accounting adjustments that had been properly made and that were responsible for APG's achieving the represented level of EBITDA. Once again, however, at this late juncture, KIK had no adequate or meaningful opportunity or ability to verify or audit these FY2005 financial statements and the year-end and other adjustments that Bachman claimed were appropriate prior to the scheduled closing on October 21, 2005.

## COUNT I:  FRAUD

### (Fraudulent Misrepresentations, Concealment & Omissions)

65.     KIK realleges and reincorporates herein paragraphs 1-64 of these Counterclaims as if the same were fully set forth herein.

### Fraudulent Misrepresentations Respecting Financial Statements

66.     Each of the Counterclaim Defendants intentionally made false representations in SPA § 3.8 respecting the Unaudited Financial Statements ("UFS") for APG that were appended to the SPA as Attachment 3.8(b).

67.     These UFS were represented by each of the Counterclaim Defendants to fairly represent the financial condition and results of operation for APG for the first 10 months of FY2005 -- *i.e.*, for the time period from October 1, 2004 through July 31, 2005.

68.     Specifically, each of the Counterclaim Defendants represented and warranted in SPA § 3.8 that the UFS fairly presented the financial condition of APG as of July 31, 2005, that they fairly presented the results of operations of APG as of July 31, 2005, that (with certain exceptions not relevant here) they had been prepared in accordance with GAAP as consistently applied by APG, and that none of the UFS was materially misstated.

69.     Notwithstanding these representations and warranties, however, the UFS did not fairly present the financial condition of APG, they did not fairly present the results of operations of APG, they were not prepared in accordance with GAAP as consistently applied, and they were in fact materially misstated in several particulars.

70.     First, the costs of sale used to compute earnings realized from the sale of products were at least $1.1 million less than they should have been (due to a failure to appropriately reserve for certain surplus inventory), resulting in an approximate $1.1 million overstatement of EBITDA for the period ending July 31, 2005.

71.     Second, certain self-insured costs were not accrued for in the UFS, as was required by GAAP, resulting in an approximate $620,000 overstatement of EBITDA for the period ending July 31, 2005 (as well as an approximately $60,000 overstatement of EBITDA in August 2005 and an approximately $60,000 overstatement of EBITDA in September 2005).

72.     Third, there are other misstatements in the UFS that reduce the EBITDA for the 10-month period ending July 31, 2005 by approximately an additional $576,000, consisting of:

(a)     a Kem Krest accounts receivable entry of approximately $150,000 for which no supporting documentation has been produced by the Former Shareholders and that, as a result, apparently does not in fact represent an actual sale of goods or billable services;

(b)     a special billing accrual of approximately $130,000 for which no supporting documentation has been produced by the Former Shareholders and that, as a result, apparently does not in fact represent an actual sale of goods or billable services;

(c)     a $120,000 vendor rebate that APG wrongly booked as income instead of as a reduction to the cost of inventory, as unequivocally required by GAAP;

(d)     underaccrual by approximately $60,000 for bad debts based on accounts receivable on APG's books as of July 31, 2005 that as of February 2006 still had not been collected;

(e)     a $57,000 account receivable from Procter & Gamble that has not been billed or collected, and for which no supporting documentation has been produced by the Former Shareholders and that, as a result, apparently does not represent an actual sale of goods or billable services;

(f)     a $32,000 overstatement of accounts receivable in the UFS as compared to the accounts receivable listed on APG's general ledger (which, *inter alia*, is contrary to the representation in SPA § 3.8 that the UFS were consistent with the books and records of APG); and

(g)     a failure to accrue on a monthly basis for $24,000 in leasing expenses, as is unequivocally required by GAAP.

73.     If the UFS had not in fact been materially misstated as set forth above, if they had in fact been prepared in accordance with GAAP as consistently applied, and if they had in fact fairly presented the financial condition and results of operation for APG, then the represented EBITDA for APG would have been approximately $2.3 million less for FY2005, KIK would have paid approximately $15 million less (i.e., 6.5X $2.3 million) for the APG Shares, and the Counterclaim Defendants would have received more than $12 million less for their APG Shares.

74.     Accordingly, Counterclaim Defendants' intentional misrepresentations respecting the UFS in SPA § 3.8 defrauded KIK out of an amount to be determined at trial, but which amount is currently believed to be approximately $15 million.

75.     Further, in asserting a claim for such fraudulent misrepresentations, concealment, and omissions, KIK does not waive and expressly reserves its right to arbitrate a claim for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA respecting the UFS.

**Fraudulent Misrepresentations, Omissions, And Concealment Respecting Connetics Sales**

76.     Connetics is a significant pharmaceutical customer of APG that purchases a sizeable volume of products that contribute substantially to APG's EBITDA.

77.     On information and belief (which is based, *inter alia*, on information obtained from APG sales personnel and the circumstances described below), Satish reached an agreement with Connetics that Connetics would take delivery of substantially all of its orders for products needed in calendar year ("CY") 2005 in the second and third quarters of CY2005, and it would purchase and take delivery of few or no products from APG in the fourth quarter of CY2005 (the first quarter that KIK owned APG). Because of Theroux's role in scheduling the production of Connetics products, and because of Bachman's role in tracking and projecting the financial performance of APG, it is further believed that Theroux and Bachman were advised or were otherwise aware of Satish's agreement with Connetics.

78.     In addition, in a meeting in August 2005, Satish learned from Connetics, but again did not disclose to KIK, that Connetics was terminating its newly-appointed distributor and therefore Connetics would essentially be without a sales force for the last quarter of CY2005 -- further confirming that there would be a material change in Connetics' purchases from APG in the fourth quarter of CY2005. Again, because of Theroux's role in scheduling the production of Connetics products, and because of Bachman's role in tracking and projecting the financial performance of APG and invoicing Connetics for such products, it is further believed that Theroux and Bachman were advised or were otherwise aware of Connetics' termination of its newly-appointed distributor and the implications of that termination for APG's sales to Connetics.

79.     As a result of the foregoing agreements and developments, none of which was disclosed to KIK prior to closing, APG sold only 4,128 units to Connetics in the fourth quarter of CY2005.

80. By way of comparison, in each of the prior quarters of CY2005, APG had sold more than 350,000 units to Connetics, for average sales of approximately 525,000 units per quarter for the first three quarters of CY2005.

81. And, instead of earning the average margin on such sales in the fourth quarter of CY2005, APG earned more than one hundred times less, for a net decline of approximately $675,000 in EBITDA the first quarter of FY2006 alone.

82. In addition, sales to Connetics continued to be substantially slower in CY2006 than they were in CY2005, given Connetics' oversupply of product.

83. Had any of the Counterclaim Defendants made KIK aware of the impending slowdown in Connetics sales prior to the closing of the Transaction, as each was obligated to do pursuant to at least SPA § 3.19 and 6.2, then KIK would have insisted on a downward adjustment to the purchase price.

84. The Counterclaim Defendants' intentional and deliberate concealment and non-disclosure of the aforementioned Connetics developments was in violation of the written representations and warranties that the Counterclaim Defendants provided in SPA § 3.19(r), which in relevant part provides that there has not been any material change in the "buying patterns" or "prospects" of any APG customer, no material customer has "threatened to decrease or limit materially … its usage of the products" of APG, and none of the Former Shareholders or APG "has any reason to believe" that any customer intends to "modify its relationship with" APG in the future. Further, Counterclaim Defendants not only made such misrepresentations as of the date of signature of the SPA on September 19, 2005, they also made such misrepresentations as of the October 21, 2005 closing of the sale of the APG Shares to KIK and

falsely certified the truthfulness of such misrepresentations as of October 21, 2005. *See* SPA §§ 3.33, 6.2(a).

85.     Thus, absent the each of the Counterclaim Defendants' intentional misrepresentations, omissions, and concealment, KIK would have been made aware of the impending slowdown in Connetics sales, and KIK would have obtained a downward adjustment to the purchase price of approximately 6.5 times the estimated effect of this slowdown on EBITDA, just as the parties had done with respect to the renegotiation of the Febreze Contract that KIK discovered during due diligence.

86.     Accordingly, KIK was defrauded by the Counterclaim Defendants' intentional and deliberate misrepresentations, omissions, and customer misrepresentations in violation of SPA § 3.19(r) in an amount to be determined at trial, but which amount is currently believed to exceed approximately $4.4 million.

87.     Further, in asserting a claim for such fraudulent misrepresentations, concealment, and omissions, KIK does not waive and expressly reserves its right to arbitrate a claim for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders breaches of SPA § 3.19 and 6.2.

### **Fraudulent Misrepresentations Respecting APG Earnings**

88.     Shortly before closing, Theroux, with the knowledge and agreement of Satish and Bachman, contacted Connetics to request that it accelerate payment of over $800,000 in receivables not yet due to APG in an attempt to improperly convert these funds properly belonging to KIK into funds distributable and to be distributed to the Former Shareholders (including the Counterclaim Defendants) at closing.

89.     Specifically, by email of October 13, 2005, Theroux sent Connetics a statement of account, on which Bachman was copied (and it is believed also was shared with Satish, given his close involvement with the Connetics business as described above), stating, in relevant part:

> Pursuant to our conversation earlier today attached is a current statement of your account.  As we discussed with our closing tentatively scheduled for the 21st it would be greatly appreciated if you could assist us in expediting payments for all of these invoices so that they can clear from our bank by that date (wire payment would be great!).

90.     APG's sales records, however, indicate that few (if any) Connetics products were actually produced and shipped by APG in September 2005; yet, according to Bachman's October 13, 2005 statement of account, Connetics was invoiced for over $800,000 worth of products in the month of September 2005 in derogation of APG's established revenue recognition policies.

91.     Four days later, on October 17, 2005, Theroux again emailed Connetics, with the knowledge and agreement of Bachman and Satish, thanking Connetics for agreeing to accelerate payment of outstanding but not yet due receivables, and stating, in relevant part:

> Thanks very much for assisting in this area.  We are all hoping that we can get through the issues that KIK now has with our trailing 12 month Ebitda and close this deal.  [¶]  When you have a moment today please contact me so we can further discuss how we can get some additional billings from Connetics into September per our conversation on Friday.

92.     Two days later, on October 19, 2005, Theroux and Bachman were advised by Connetics (and it is believed that they immediately advised Satish, given his close involvement with the Connetics business as described above) that Connetics was wiring to APG approximately $880,000 for the outstanding receivables, all of which would be received by APG no later than the following day, October 20, 2005 -- the day before KIK was to close on its purchase of the APG Shares.

93.     Further, it is apparent that Theroux and Bachman, with the knowledge and agreement of Satish, sought to accelerate receipt of payments being made from other customers as well, but were unsuccessful in at least one instance.

94.     Theroux and Bachman, with the knowledge and consent of Satish, attempted to back-date sales to Connetics to make it appear as though these sales were actually made in September 2005 instead of October 2005 in an effort to cover-up and conceal from KIK the precipitous decline in Connetics sales resulting from earlier agreements between APG and Connetics to allocate sales to the earlier part of CY 2005 and resulting from Connetics' termination of its distributor.

95.     In addition, in unequivocal derogation of GAAP and APG's established revenue recognition practices and policies, in October 2005, Bachman and Theroux, with the knowledge and agreement of Satish, created invoices for certain work in progress or yet to be performed and then booked as income in September 2005 these amounts that were first invoiced in October 2005.

96.     These attempts retroactively to enlarge APG's earnings for the year-ending September 30, 2005 were undertaken by Counterclaim Defendants in an effort to further conceal and hide from KIK the materially declining financial performance of APG, and, in particular, the shortfall in EBITDA for FY2005 relative to that which was represented to KIK to be achievable in FY2005 and which was represented to KIK had been achieved in FY2005.

97.     The failure of the Counterclaim Defendants to disclose the aforementioned Connetics developments to KIK was contrary to the express representations that each of the Counterclaim Defendants provided in SPA § 3.19(r), which in relevant part provided that there had not been any material change in the "buying patterns, payment practices, or … prospects" of

any APG customer, no material customer had "threatened to decrease or limit materially … its usage of the products" of APG, and none of the Former Shareholders or APG "has any reason to believe" that any customer intended to "modify its relationship with" APG in the future. This representation was knowingly false when first made by Counterclaim Defendants in the September 19, 2005 SPA, and it was further knowingly false when remade and certified by Counterclaim Defendants on the October 21, 2005 closing of the sale of APG to KIK. *See* SPA §§ 3.33, 6.2(a), and Sellers Closing Certificate pursuant to SPA § 6.2(a) (hereafter the "Certificate").

98. This conduct further demonstrates that Counterclaim Defendants intentionally misrepresented in SPA § 3.19 and 3.19(h) that the APG has "conducted the Business in the ordinary course consistent with past practices," and that since September 30, 2004 there had not been any "[c]hange in accounting principles, methods or practices … or any change in the cash management customs and practices of the Acquired Companies (including, without limitation, with respect to … collection of accounts receivable and payment of accounts payable)." This representation was knowingly false when first made by Counterclaim Defendants in the September 19, 2005 SPA, and it was further knowingly false when remade and certified by Counterclaim Defendants on the October 21, 2005 closing of the sale of APG to KIK. *See* SPA §§ 3.33, 6.2(a), and Certificate.

99. Satish, with the knowledge and agreement of Theroux and Bachman, further falsely certified in the Certificate that APG had fulfilled all conditions set forth in SPA § 6.2(a), including the condition that the Acquired Companies had "performed and complied with, in all material respects, all ***covenants*** and agreements required by [the SPA] to be performed or complied with by any of them on or prior to the Closing." SPA § 6.2(a) (emphasis added). One

of these "covenants" that Counterclaim Defendants falsely certified compliance with was the covenant that between September 19, 2005 and October 21, 2005, Counterclaim Defendants had kept KIK's senior management "fully and promptly informed of any inquiries from, or communications with, customers … and of all material information relating to the Business and its prospects of which … the Acquired Companies become aware."  SPA § 7.6.  Another of these covenants that Counterclaim Defendants falsely certified compliance with was that subsequent to execution of the SPA and prior to closing, the Acquired Companies had not collected "accounts receivable in a manner that is inconsistent with normal and past practice."  SPA § 7.4(c).  And Counterclaim Defendants, through their Sellers Representative, Satish, likewise falsely certified compliance with and the truthfulness of their representation that "All accounts receivable of the Acquired Companies that are reflected … on the accounting records of the Acquired Companies as of the Closing Date … represent or will represent valid obligations of the payors thereunder arising from sales actually made or services actually performed in the ordinary course of business.  SPA § 3.9(a).

100.    The Counterclaim Defendants' certification of compliance with such covenants and representations was knowingly false when made on or about October 21, 2005, and it was intended to and succeeded in inducing KIK to proceed to close on the purchase of APG at an inflated price of approximately $73 million.

101.    If Counterclaim Defendants had not falsely represented the EBITDA of APG, falsely represented that they were unaware of any changes in customer buying patterns and practices, falsely represented that there had been no change in APG's practices respecting the collection of accounts receivable, and had not falsely made the other representations referenced in the foregoing and falsely certified that they and APG had complied with the written covenants

provided in the SPA and that their representations were truthful and correct as of closing, then the substantial and material decline in the FY2005 EBITDA for APG would have been disclosed to KIK, KIK would not have been obligated to close on the purchase of the APG Shares for a price of $73 million, and it would not have closed on the purchase of the APG Shares for that price.

102.     In particular, SPA § 6.2(g) conditioned KIK's obligation to close on the purchase of the APG Shares on the non-occurrence of any events that individually or in the aggregate constitute a "Material Adverse Effect," which SPA § 11.8(ee) defines, *inter alia*, as "any change, effect, event, occurrence, state of facts or development that, individually or in the aggregate with any other change, effect, event, occurrence, state of facts or development, is: (i) materially adverse to the financial condition or results of operations of the Acquired Companies taken as a whole…."

103.     But for Counterclaim Defendants' intentionally false and misleading representations and certification, fraudulent concealment and omissions,  KIK would have been advised of the decline in Connetics sales and the shortfall in APG's EBITDA, and it would have insisted on a downward adjustment of the purchase price to account for the overstatement of FY2005 EBITDA for the Company, decreasing the price by $6.50 for every $1.00 reduction in FY2005 EBITDA.

104.     Further, in asserting a claim for such fraudulent misrepresentations, concealment, and omissions, KIK does not waive and expressly reserves its right to assert a claim for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA.

**Fraudulent Misrepresentations, Omissions And Concealment Respecting Distribution Center**

105.     On or about September 8, 2005, as part of the due diligence process, KIK toured APG's new distribution center that was under construction.

106.     At the time, KIK was concerned that this significant and complex capital project was not being and/or could not be appropriately managed and overseen by APG management. However, as commitments already had been made, and the work already was in progress, discontinuing the project upon purchase was not a viable option.

107.     To address these and other concerns, the SPA required APG to make certain scheduled payments relating to this project prior to closing so that these monies paid by APG would be for the Former Shareholders' (including the Counterclaim Defendants') and not KIK's account.  *See* SPA §§ 3.19(i), 7.5, Sched. 3.19(i) & Att. 3.19(i), Sched. 7.5.

108.     In addition, prior to the closing on the sale of the APG Shares to KIK, the SPA required the Former Shareholders (including the Counterclaim Defendants) to refrain from making any material capital commitments on behalf of APG other than those disclosed in Schedule 3.19 & Attachment 3.19(i).  *See* SPA § 3.19.

109.     Moreover, the Former Shareholders (including each of the Counterclaim Defendants) further covenanted as follows in SPA § 7.6:

> Between the date of this Agreement and the Closing, the Sellers' Representative shall keep David Cynamon, Howard Brodie and/or Paul Richardson, on behalf of the Buyer, fully and promptly informed of any inquiries from, or communications with, customers or suppliers of the Business regarding the transaction of purchase and sale contemplated hereby, and of all material information relating to the Business and its prospects of which any of the Sellers or the Acquired Companies become aware.

110.     The Former Shareholders (including each of the Counterclaim Defendants) also represented that APG had valid and sufficient licenses for all software and intellectual property

being used in connection with the business of APG, and the Former Shareholders (including each of the Counterclaim Defendants) further represented that they would not spend more than $50,000 on any such software or other licenses other than as elsewhere disclosed. *See* SPA §§ 3.17 & 3.12(m).

111. These representations were false because prior to the closing on the sale of the APG Shares to KIK, each of the Counterclaim Defendants became aware of -- but intentionally did not disclose to KIK -- three issues with this new distribution center, including: (1) new capital commitments for cost overruns associated with an automated palletizing system that was being installed; (2) new capital commitments for construction cost overruns associated with the warehouse for the new distribution center; and (3) unbudgeted software licensing costs associated with an inventory control and management software package that was to be installed in the new distribution center. Notably, any capital expenditure request made was required to be signed off by Theroux, Bachman, and Satish, and therefore it is reasonable to presume that each was aware of but intentionally failed and refused to disclose these matters to KIK.

112. With respect to the palletizing system for the new distribution center, the costs have exceeded by approximately $400,000 the costs that the Former Shareholders (including each of the Counterclaim Defendants) represented would be required to complete construction of the palletizing system. On information and belief, prior to closing, Theroux and Bachman were aware that these overruns by virtue of their oversight of the distribution center project, and they advised Satish that APG was substantially altering the scope of this project following execution of the SPA but prior to closing; each of the Counterclaim Defendants intentionally did not disclose to and did conceal from KIK this change in scope, contrary to the written representations and covenants each made in SPA §§ 3.19(i) and 7.6.

113. With respect to construction of the warehouse for the new distribution process, the costs have exceeded by approximately $600,000 the costs that the Former Shareholders (including each of the Counterclaim Defendants) represented would be required to finish construction of the distribution center. On information and belief, Theroux and Bachman were aware by virtue of their oversight of the distribution center project, and they advised Satish, of some or all of these cost overruns or the likelihood of such cost overruns prior to closing, but Counterclaim Defendants again intentionally failed to disclose them to and concealed them from KIK, contrary to their written representations and covenants in SPA §§ 3.19(i) and 7.6.

114. With respect to the software expenditures, APG purchased a software inventory management and control system for Kem Krest's use, but it then neglected to purchase and/or budget for the cost of installing similar software in the new distribution center, which Theroux, Bachman, and Satish must have known given the expense associated with the same. Counterclaim Defendants also failed to account for a change-of-control provision in the ERP system software, which required the software to be relicensed at an approximate cost of $219,000 when KIK acquired the APG Shares. In addition, KIK has learned that approximately $50,000 will be needed to address problems with the software that was chosen and installed. On information and belief, Theroux and Bachman were aware by virtue of their oversight of the distribution center project, and they advised Satish, of some or all of these software issues or the likelihood of such software issues prior to closing, but Counterclaim Defendants again intentionally failed to disclose them to and concealed them from KIK, contrary to their written representations and covenants in SPA §§ 3.12(m), 3.17, 3.19(i) and 7.6.

115. If Counterclaim Defendants had not intentionally misrepresented the aforementioned and had not intentionally failed to disclose, concealed and withheld the material

information respecting the aforementioned, then KIK would have obtained a separate agreement for the Former Shareholders to indemnify KIK for any such amounts, as KIK did with respect to other such issues that arose prior to closing.

116.    Accordingly, as a result of the Counterclaim Defendants' aforementioned intentional misrepresentations, omissions and concealment respecting the distribution center, KIK has been defrauded and it is entitled to recover from the Counterclaim Defendants in the approximate amount of $1.3 million.

117.    Further, in asserting a claim for such fraudulent misrepresentations, concealment, and omissions, KIK does not waive and expressly reserves its right to arbitrate a claim for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA.

### Fraudulent Misrepresentations, Omissions, And Concealment Respecting US Consults Claims

118.    Each of the Counterclaim Defendants represented and warranted in SPA § 3.12, that except as disclosed in Schedule 3.12, APG was not a party to or bound by any "Material Contracts," which includes, *inter alia*: (1) any consulting agreement that provides for annual compensation in excess of $50,000 per year and that cannot be terminated without penalty or cost on thirty days or less notice (*see* SPA § 3.12(a)); (2) any contract or group of related contracts for the purchase of services requiring remaining aggregate payments in excess of $50,000 (*see* SPA § 3.12(d)); and (3) any one or more contracts with the same entity involving aggregate payments in excess of $50,000 (*see* SPA § 3.12(e)).

119.    Each of the Counterclaim Defendants further represented and warranted in SPA § 3.12, that APG made available to KIK "a correct and **complete** copy of each written Material

Contract and a true and correct description of all material terms of each oral Material Contract." (Emphasis added)

120.    Each of the Counterclaim Defendants further represented and warranted in SPA § 3.12 that other than as disclosed in Schedule 3.12 to the SPA: (1) "no Material Contract has been breached or cancelled by" APG, or, "to the Sellers' Knowledge any other party" (SPA § 3.12(ii)); and (2) "APG has performed in all material respects all the obligations required to be performed by it in connection with the Material Contracts and is not in default under or in breach of any such Material Contract, and no event has occurred which with the passage of time or the giving of notice or both would result in a default or breach thereunder." *See* § SPA § 3.12(ii).

121.    Each of the Counterclaim Defendants further represented and warranted in SPA § 3.15, that other than as disclosed in Schedule 3.15 to the SPA, since January 1, 2000 there have not been and are no actions, proceedings, investigations, judgments, grievances, arbitrations, suits, claims or orders pending or threatened against APG.

122.    Each of the Counterclaim Defendants further represented and warranted in SPA § 3.28, that other than "Liabilities" (*i.e.*, indebtedness, liabilities or obligations of any nature -- whether accrued, absolute, contingent, direct, indirect, known, unknown, or otherwise, whether due or to become due) disclosed in Schedules 3.8, 3.12, and 3.28 to the SPA, and other than "Liabilities" included as current liabilities in the target net working capital, APG has no further "Liabilities" for breach of contract, breach of warranty, tort or a claim or lawsuit. *See* SPA §§ 3.28, 11.8(cc).

123.    Each of the Counterclaim Defendants further represented and warranted in SPA § 4.3 that there were no actions, proceedings, investigations, judgments, grievance, arbitrations,

claims or orders pending, or, to "Sellers' Knowledge," threatened against any of the Counterclaim Defendants.

124.    One of the Material Contracts disclosed by the Former Shareholders in Schedule 3.12 to the SPA was an "Agreement dated April 23, 2001 between US Consults and APG Pac, Inc." (hereafter the "4/23/01 Agreement"), which was signed by Theroux on behalf of APG, and which, by its terms, committed APG to pay US Consults certain consulting fees for services that US Consults rendered in connection with obtaining offers of financial assistance from state and local governments.

125.    Schedule 3.12 to the SPA, however, does not list or disclose a November 3, 2003 agreement, styled "APG, Inc. and US Consults Addendum to Consulting Agreement" (hereafter the "Addendum"), that was apparently signed by Satish on behalf of APG and that contemplated the payment by APG to US Consults of $150,000 for services that US Consults apparently performed on behalf of APG.

126.    Schedule 3.12 to the SPA also does not list or disclose a January 22, 2004 agreement, styled "Release And Settlement Agreement" (hereafter "Settlement Agreement"), that was apparently signed by Theroux on behalf of APG, and that contemplated the payment by APG to US Consults of $217,000 for services that US Consults apparently performed on behalf of APG.

127.    Nor was a copy of the Addendum or Settlement Agreement provided to KIK by the Former Shareholders with the 4/23/01 Agreement prior to the closing of the sale of the APG Shares to KIK.

128.    Further, none of the Counterclaim Defendants or other Former Shareholders or their agents ever disclosed to KIK that US Consults had threatened to assert claims against APG,

Satish, and/or Theroux for: (1) a commission that US Consults claimed it was due pursuant to the 4/23/01 Agreement for services that US Consults purportedly performed in securing for APG an offer of relocation assistance from the State of Connecticut; and (2) damages to US Consults resulting from APG's purported breach of its agreement to relocate to Connecticut and accept the relocation assistance and other benefits that the State of Connecticut had offered APG.

129.    Notwithstanding this, US Consults contacted KIK and advised KIK that APG owed US Consults approximately $300,000 for a commission due and payable to US Consults under the 4/23/01 Agreement.  KIK's counsel thereafter spoke with counsel for US Consults in an attempt to better understand US Consults' claimed entitlement to a $300,000 commission from APG.

130.    Subsequently, in January 2007, US Consults' counsel advised KIK's counsel in writing that US Consults also had an additional claim against APG for fraud and bad faith in connection with APG's breach of an agreement with the State of Connecticut to relocate, which allegedly deprived US Consults of an additional commission and allegedly foreclosed US Consults from obtaining further offers from the State of Connecticut for US Consults' clients, which US Consults' counsel contends entitles US Consults to as much as an additional $20 million in compensation from APG.

131.    On or about January 18, 2007, KIK notified Counterclaim Defendants' counsel in writing of US Consults' assertions of its claims and demanded that the Former Shareholders promptly advise KIK whether they would assume the defense of the US Consults claims pursuant to SPA § 8.6.

132.     On information and belief, the Former Shareholders are refusing to assume the defense of the US Consults claims, requiring KIK to incur legal fees and other costs to defend against these claims.

133.     Further, based on information provided by counsel for US Consults, KIK believes that the Counterclaim Defendants, and in particular Satish and Theroux, with the knowledge and agreement of Bachman, were aware of US Consults claims for additional commissions under the 4/23/01 Agreement but intentionally refused and failed to disclose the same, intentionally refused and failed to disclose the related Addendum and the Settlement Agreement, and intentionally refused and failed to disclose the potential "Liabilities" associated with US Consults Claims.

134.     Moreover, based on the information provided by counsel for US Consults, US Consults also has claims against at least Satish and Theroux in their personal capacities for fraudulent representations made by them to US Consults in respect of the disputed commissions.

135.     As a result, KIK is entitled to recover from the Counterclaim Defendants for the losses that their intentional misrepresentations and omissions pursuant to SPA §§ 3.12, 3.15, 3.28, and/or 4.3 have caused and may cause KIK to incur.

136.     Further, in asserting a claim for such fraudulent representations, concealment, and omissions, KIK does not waive and expressly reserves its right to submit a claim for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in SPA §§ 3.12, 3.15, 3.28 and/or 4.3.

**Scienter, Reliance, Proximate Cause and Damages**

137.     The aforementioned misrepresentations, concealment, and omissions by Counterclaim Defendants were intentional and were knowingly made by each of them so as to

unfairly inflate the earnings for APG and the corresponding price for their APG Shares, thereby increasing the amount of money that each of the Counterclaim Defendants received from KIK for his or its APG Shares.

138.    Moreover, as set forth above, these Counterclaim Defendants made further intentionally false and misleading affirmative representations so as to conceal from KIK the true financial performance and condition of APG, and they further intentionally and fraudulently omitted information that they had contractual and other duties to disclose to KIK.

139.    KIK justifiably and reasonably relied to its detriment on Counterclaim Defendants' representations in the SPA, in the attendant certifications delivered in connection with the closing of the sale of APG to KIK, and on the Counterclaim Defendants' concealment and omissions.  But for such intentionally false representations, concealment and omission, KIK would not have agreed to pay, and would not have paid, $73 million for the APG Shares.

140.    As a proximate result of Counterclaim Defendants' intentional, deliberate and willful misrepresentations, fraudulent concealment, and omission, KIK has been damaged in an amount to be proved at trial, but which amount of compensatory damages is currently believed to exceed $20 million, exclusive of prejudgment interest, and less any amount of indemnification received by KIK from the Former Shareholders for breach of the aforementioned representations and certifications.

141.    Further, the fraud perpetrated by Counterclaim Defendants on KIK entitles KIK to recover punitive damages from Counterclaim Defendants in an amount to be determined at trial. Counterclaim Defendants' false representations, concealment, and omissions were not the result of mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing.  To the contrary, Counterclaim Defendants' deliberate misrepresentations and

omissions amount to malicious, tortious and fraudulent conduct that warrants deterrence through an award of punitive damages.

## COUNT II:  SECURITIES FRAUD

### (Rule 10b-5 of the Securities and Exchange Act)

142.    KIK realleges and reincorporates herein paragraphs 1-141 of these Counterclaims as if the same were fully set forth herein.

143.    As set forth above, each of the Counterclaim Defendants made repeated untrue statements of fact, and concealed and omitted to disclose material facts that he or it was obligated to disclose, that, in light of the circumstances recited above, resulted in misleading written statements in connection with KIK's purchase of the APG Shares.

144.    Counterclaim Defendants' intentional misstatements and omissions were made using instrumentalities of interstate commerce, including long distance telephone lines, cellular telephones, e-mail, and the United States mail.

145.    Counterclaim Defendants, through these intentional and material misstatements and omissions, employed devices, schemes and/or artifices to defraud KIK, as set forth above.

146.    The aforementioned untrue statements of fact and omissions related to material issues with respect to the sale of the APG Shares, including the subject matter of the aforementioned representations and warranties that were negotiated by the parties in drafting the SPA.

147.    Any reasonable purchaser or seller of securities would consider Counterclaim Defendants' misrepresentations regarding the financial condition and business of the target company to be material in deciding whether to buy or sell such securities.

148.    KIK reasonably relied on the Counterclaim Defendants' fraudulent financial statements to value APG and to formulate the purchase price for the APG Shares, and therefore

Counterclaim Defendants' intentional misrepresentations and omissions were material to KIK's decision to purchase the APG Shares at the price of $73 million.

149.     Moreover, as set forth above, Counterclaim Defendants made their material misstatements and omissions intentionally, knowingly, and/or with reckless disregard for the truth of such misstatements, and the likelihood for such omissions to mislead KIK.

150.     Further, these material misstatements and omissions were made by Counterclaim Defendants during the negotiation of the SPA, during the due diligence period, and at other times prior to or at the closing of the APG sale, and were therefore made in connection with the sale of the APG Shares.

151.     KIK justifiably relied on Counterclaim Defendants' intentional misstatements and omissions in negotiating the purchase price for the APG Shares, which was based on the EBITDA figures fraudulently provided by Counterclaim Defendants during the negotiation process prior to the closing of the sale and that were falsely represented to fairly state the financial performance and condition of APG in all material respects.

152.     Counterclaim Defendants' intentional misstatements and omissions resulted in an overvaluation of APG Shares that proximately caused KIK to pay substantially more for the APG Shares than they were worth, and thereby suffer a monetary injury in excess of $20 million.

153.     Further, in asserting a claim for such securities fraud, KIK does not waive and expressly reserves its right to arbitrate claims for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA.

## COUNT III: ICVRA -- CRIMINAL MISCHIEF & DECEPTION

### (IND. CODE §§ 34-24-3-1, 35-43-1-2, 35-43-5-3)

154.     KIK realleges and reincorporates herein paragraphs 1-153 of these Counterclaims as if the same were fully set forth herein.

155.     IND. CODE § 34-24-3-1, also known as the Indiana Crime Victims Relief Act ("ICVRA"), states in relevant part as follows:

 If a person suffers a pecuniary loss as a result of a violation of IND. CODE 35-43, IND. CODE 35-42-3-3, IND. CODE 35-42-3-4, or IND. CODE 35-45-9, the person may bring a civil action against the person who caused the loss for the following:

(1) An amount not to exceed three (3) times the actual damages of the person suffering the loss.

(2) The costs of the action.

(3) A reasonable attorney's fee.

### Criminal Mischief

156.     Among the predicate offenses that may support a claim for relief under ICVRA is "criminal mischief" under Indiana Code Section 35-43-1-2, which reads in relevant part as follows:

Sec. 2. (a) A person who:

* * *

(2) knowingly or intentionally causes another to suffer pecuniary loss by deception …

commits criminal mischief…

157.     The aforementioned misrepresentations, misstatements, and omissions of material fact in the representations and warranties of the SPA, the accompanying financial statements and projections, and in other representations and omissions by Counterclaim Defendants were made

intentionally and knowingly with an intent and awareness that the same would cause KIK to suffer pecuniary losses.

158.    These misrepresentations, misstatements and omissions deceived KIK, and that deception directly and proximately caused KIK to suffer a pecuniary loss in excess of $20 million, less any amount of indemnity KIK receives from the Former Shareholders for breach of SPA representations, warranties, and/or covenants.

## Deception

159.    Indiana Code Section 35-43-5-3(a) sets forth eleven acts that constitute deception, including the following:

> (2) knowingly or intentionally mak[ing] a false or misleading written statement with intent to obtain property …
>
> *****
>
> (6) with intent to defraud, misrepresent[ing] … the identity or quality of property;
>
> *****

160.    Sellers knowingly and intentionally made the aforementioned false and misleading written statements with intent to obtain property of KIK, specifically funds in excess of $20 million.

161.    As alleged above, these false and misleading written statements were made in representations, warranties, and other statements in the parties' written SPA, written drafts of that agreement, e-mail correspondence between the parties, and in written financial statements given by Counterclaim Defendants to KIK in connection with the sale of APG Shares.

162.    Further, Counterclaim Defendants, with the intent to defraud, misrepresented the quality of the property, specifically APG and its finances, to KIK.

163. Finally, Counterclaim Defendants disseminated information to KIK regarding APG that Counterclaim Defendants knew was false, misleading, and deceptive, with an intent to promote the purchase of the APG Shares by KIK at an inflated price.

164. Counterclaim Defendants' false and misleading statements, and their intentional misrepresentations regarding the quality of the APG property at issue in the sale, directly and proximately caused KIK to suffer a pecuniary loss in excess of $20 million, before trebling, and less any amount of indemnity KIK receives from the Former Shareholders for breach of SPA representations, warranties, and/or covenants.

165. Further, in asserting such claims under ICVRA, KIK does not waive and expressly reserves its right to arbitrate claims for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA.

## COUNT IV:  DECLARATORY JUDGMENT

### (Bachman Termination For Cause)

166. KIK realleges and reincorporates herein paragraphs 1-165 of these Counterclaims as if the same were fully set forth herein.

167. This is a claim for declaratory relief under 28 U.S.C. § 2201.  Specifically, KIK seeks a judgment declaring that it properly terminated for cause the written employment agreement and employment of Bachman.

168. On or about October 21, 2005, in connection with the sale of the APG Shares to KIK, Bachman and APG Inc. entered into an employment agreement (the "Bachman Agreement").

169.     As permitted by the Bachman Agreement, non-party APG Inc., which is owned by KIK, has assigned to KIK all of APG's rights, obligations and interest in and to the Bachman Agreement.

170.     The Bachman Agreement allows KIK to terminate Bachman for cause based on certain enumerated grounds for dismissal, and subject to certain procedural requirements contained in §§ 12(b) and 16 of the agreement.

171.     On September 20, 2006, pursuant to § 12(b) the agreement, KIK provided written notice to Bachman, advising him that it had grounds to terminate the Bachman Agreement and his employment for cause, specifying with reasonable detail the grounds for doing so, and providing Bachman with contemporaneous documents supporting its position.

172.     KIK's notice further invited Bachman to provide KIK with any additional information in writing that Bachman wished KIK to consider before KIK decided whether to terminate or continue the Bachman Agreement and his employment, giving Bachman seven days to do so.

173.     On September 25, 2006, Bachman sent a one-page letter to KIK that included a general denial of all wrongdoing by him, an unexplained and unsupported assertion that he did not believe that there was good cause for his termination, and a threat to bring suit against KIK in the event that he was terminated.  Bachman's letter did not object to the assignment by APG to KIK of the Bachman Agreement.

174.     In short, Bachman's letter failed to present to KIK any substantive written information relevant to his termination.

175.     After receiving Bachman's letter, and reviewing the other facts and circumstances that it considered relevant, KIK decided to terminate the Bachman Agreement and Bachman's

employment, effective as of the close of business September 29, 2006, and on that date sent him written notice of the same.

176.   As a result of Bachman's September 25, 2006 letter, KIK has a reasonable apprehension that Bachman will file a lawsuit against KIK contending that KIK did not have cause to terminate the Bachman Agreement and his employment and that KIK is therefore liable to him for several hundred thousand dollars.   Further, Bachman's counsel has subsequently disputed the validity of the assignment of the Bachman Agreement to KIK from APG.

177.   Therefore, a valid and justiciable controversy has arisen and exists between KIK and Bachman within the meaning of 28 U.S.C. § 2201.

178.   A judicial declaration that the Bachman Agreement was properly assigned to KIK and that the Bachman Agreement and Bachman's employment were properly terminated for cause is necessary and appropriate in order to resolve this controversy.

179.   In the alternative, should the Court declare that the assignment of the Bachman Agreement to KIK from APG is invalid, the Court should nonetheless declare that KIK's subsidiary, APG, was entitled to terminate the Bachman Agreement and Bachman's employment for cause and that APG should be deemed to have done so effective as of September 29, 2006.

180.   Further, in asserting this claim for declaratory judgment, KIK does not waive and expressly reserves its right to arbitrate claims for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA.

## COUNT V:  DECLARATORY JUDGMENT

### (Theroux Termination For Cause)

181.     KIK realleges and reincorporates herein paragraphs 1-180 of these Counterclaims as if the same were fully set forth herein.

182.     This is a claim for declaratory relief under 28 U.S.C. § 2201.  Specifically, KIK seeks a judgment declaring that it properly terminated for cause the written employment agreement and employment of Theroux.

183.     On or about October 21, 2005, in connection with the sale of the APG Shares to KIK, Theroux and APG Inc. entered into an employment agreement (the "Theroux Agreement").

184.     As permitted by the Theroux Agreement, non-party APG Inc., which is owned by KIK, has assigned to the KIK all of APG's rights, obligations and interest in and to the Agreement.

185.     The Theroux Agreement allows KIK to terminate Theroux for cause based on certain enumerated grounds for dismissal, and subject to certain procedural requirements contained in §§ 12(b) and 16 of the agreement.

186.     On September 20, 2006, pursuant to § 12(b) the agreement, KIK provided written notice to Theroux, advising him that it had grounds to terminate the Theroux Agreement and his employment for cause, specifying with reasonable detail the grounds for doing so, and providing Theroux with contemporaneous documents supporting its position.

187.     KIK's notice further invited Theroux to provide KIK with any additional information in writing that Theroux wished KIK to consider before KIK decided whether to terminate or continue the Theroux Agreement and his employment, giving Theroux seven days to do so.

188.    On September 26, 2006, Theroux sent a two page letter to KIK that included a general denial of all wrongdoing by him, an unexplained and unsupported assertion that he did not believe that there was good cause for his termination, and a threat to bring suit against KIK in the event that he was terminated.  Theroux's letter did not object to the assignment by APG to KIK of the Theroux Agreement.

189.    In short, Theroux's letter failed to present to KIK any substantive written information relevant to his termination.

190.    After receiving Theroux's letter, and reviewing the other facts and circumstances that it considered relevant, KIK decided to terminate the Theroux Agreement and Theroux's employment, effective as of the close of business September 29, 2006, and on that date sent him written notice of the same.

191.    As a result of Theroux's September 26, 2006 letter, KIK has a reasonable apprehension that Theroux will file a lawsuit against KIK contending that KIK did not have cause to terminate the Theroux Agreement and his employment and that KIK is therefore liable to him for several hundred thousand dollars.  Further, Theroux's counsel has subsequently disputed the validity of the assignment of the Theroux Agreement to KIK from APG.

192.    Therefore, a valid and justiciable controversy has arisen and exists between KIK and Theroux within the meaning of 28 U.S.C. § 2201.

193.    A judicial declaration that the Theroux Agreement was properly assigned to KIK and that the Theroux Agreement and Theroux's employment was properly terminated for cause is necessary and appropriate in order to resolve this controversy.

194.    In the alternative, should the Court declare that the assignment of the Theroux Agreement to KIK from APG is invalid, the Court should nonetheless declare that KIK's

subsidiary, APG, was entitled to terminate the Theroux Agreement and Theroux's employment for cause and that APG should be deemed to have done so effective as of September 29, 2006.

195.    Further, in asserting this claim for declaratory judgment, KIK does not waive and expressly reserves its right to arbitrate claims for indemnification against the Former Shareholders in the arbitration pending in Chicago, Illinois for the Former Shareholders' breaches of their representations, warranties, covenants and agreements in the SPA.

## PRAYER FOR RELIEF

WHEREFORE, KIK prays for an award of the following relief in its favor and against Satish Shah, the Satish Shah Revocable Trust, Robert E. Theroux, and/or Frederick H. Bachman:

A.    Compensatory damages from Counterclaim Defendants in an amount to be proven at trial, but which amount is currently believed to be substantially in excess of $20 million (exclusive of reasonable attorneys' fees, interest, and costs of litigation; before trebling; and before setoff for any amounts of indemnification that KIK recovers from the Former Shareholders pursuant to its pending arbitration that are properly setoff against KIK's Counterclaims;

B.    Costs of litigation and related expenses;

C.    Punitive damages on Count I;

D.    Attorneys' fees on Counts II, III, IV and V;

E.    Pre- and post-judgment interest on all Counts;

F.    Treble KIK's compensatory damages on Count III;

G.      A declaration that the Bachman Agreement was properly assigned to KIK and that the Bachman Agreement and Bachman's employment were properly terminated for cause on Count IV;

H.      A declaration that the Theroux Agreement was properly assigned to KIK and that the Theroux Agreement and Theroux's employment were properly terminated for cause on Count V; and/or

I.      All further and other relief to which KIK is now or may hereafter become entitled under applicable law.

Dated: January 18, 2007                          KIK International LLC


                                                 BY:    _/s/ Drew G.A. Peel_____
                                                 One of its attorneys

                                                 Attorneys for Defendant/Counterclaim Plaintiff
                                                 KIK INTERNATIONAL LLC

Drew G.A. Peel (N.D. Ind. Bar # 6206846)
Colby Anne Kingsbury (N.D. Ind. Bar # 6272842)
Daniel C. Moore (N.D. Ind. Bar # 6286898)
Harry N. Niska (N.D. Ind. Bar # 6288460)
Kirkland & Ellis LLP
200 East Randolph Drive
Chicago, Illinois  60601
(312) 861-2000 (tel.)
(312) 861-2200 (fax)
dpeel@kirkland.com

## CERTIFICATE OF SERVICE

I, Drew G. A. Peel, hereby certify that a copy of the *Defendant's First Amended Answer, Affirmative Defenses, and Counterclaims* was served upon the following attorneys of record by filing through the Northern District of Indiana's CM/ECF system on the 18th day of January 2007.

Timothy J. Abeska
tim.abeska@btlaw.com

Robert G. Devetski
robert.devetski@btlaw.com

Brian E. Casey
brian.casey@btlaw.com

Kelly J. Hartzler
Kelly.hartzler@btlaw.com

Barnes & Thornburg LLP
600 1st Source Bank Center
100 N. Michigan Street
South Bend, Indiana 46601

KIRKLAND & ELLIS LLP

By    /s/ Drew G.A. Peel
     Drew G. A. Peel

Attorney for Defendant/Counterclaim Plaintiff