UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

SATISH SHAH, THE SATISH SHAH
REVOCABLE TRUST, AMISH SHAH, DEBRA
ANN SHAH, ROBERT E. THEROUX, DANIEL L.
WILLIAMS and FREDERICK H. BACHMAN

       Plaintiffs,

v.

KIK INTERNATIONAL LLC,

       Defendant.

**CASE NO. 3:06–CV–0712 RM**

**Chief Judge Robert L. Miller, Jr.**

**Magistrate Christopher A. Neuchterlein**

## KIK'S BRIEF IN OPPOSITION TO
## <u>COUNTERCLAIM DEFENDANTS' MOTION TO DISMISS</u>

Drew G. A. Peel (N.D. Ind. Bar # 6206846)
Colby Kingsbury (N.D. Ind. Bar # 6272842)
Daniel C. Moore (N.D. Ind. Bar # 6286898)
Harry N. Niska (N.D. Ind. Bar # 6288460)
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601
(312) 861-2000 (tel.)
(312) 861-2200 (fax)
dpeel@kirkland.com

*Attorneys for Defendant KIK International LLC*

# Table of Contents

I.     **Introduction**.................................................................................................................1

II.    **Applicable Standards**................................................................................................3

III.   **Background** .................................................................................................................5

      A.     The Controlling Sellers. ..................................................................................6

      B.     The Controlling Sellers' Statements And Omissions. ...........................10

      C.     Controlling Sellers' Statements And Omissions Were False And
            Misleading................................................................................................15

      D.     The Controlling Sellers' Scienter...................................................................17

      E.     The Controlling Sellers' Misleading Statements And Omissions
            Proximately Caused KIK To Sustain The Losses It Seeks To Recover
            Here...........................................................................................................18

IV.   **Argument** .................................................................................................................**18**

      A.     KIK's Common-Law Fraud Claims Should Not Be Dismissed. ...........18

            1.     None Of KIK's Fraud Claims Is Legally Insufficient As Pled.................18

            2.     Each Of KIK's Fraud Claims Is Pled With Sufficient Particularity. .........23

      B.     KIK's Rule 10b-5 Claims Should Not Be Dismissed............................26

      C.     KIK's ICVRA Claims Should Not Be Dismissed. .............................32

      D.     KIK's Declaratory Judgment Claims Should Not Be Dismissed. ........33

V.    **Conclusion** ...............................................................................................................**35**

# Table of Authority

## Cases

*Abbott v. Bates*,
670 N.E.2d 916 (Ind. Ct. App. 1996) .............................................................................. 8

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ...................................................................................... 26

*Am.'s Directories Inc. v. Stellhorn One Hour Photo, Inc.*,
833 N.E.2d 1059 (Ind. Ct. App. 2005) ........................................................................... 19

*Am's Directories, Inc. v. Stellhorn One Hour Photo, Inc.*,
833 N.E.2d 1059 (Ind. Ct. App. 2006) ........................................................................... 22

*American United Life Ins. Co. v. Douglas*,
808 N.E.2d 690 (Ind. Ct. App. 2004) ............................................................................. 23

*Automobile Underwriters, Inc. v. Rich*,
53 N.E.2d 775 (Ind. 1944) ....................................................................................... 21, 22

*Bernstein v. Kelso & Co., Inc.*,
231 A.D.2d 314, 659 N.Y.S.2d 276, 280 (1st Dep't 1997) ............................................ 23

*Brugos v. Nannenga*,
No. 2:03-CV-547 RM, 2005 WL 3299506 (N.D. Ind. Dec. 5, 2005) ......................... 4, 19

*Caremark, Inc. v. Coram Healthcare Corp.*,
113 F.3d 645 (7th Cir. 1997) ..................................................................................... 5, 31

*Carrell v. George Weston Bakeries Distribution, Inc.*,
No. 1:05-CV-01769-SEBJPG, 2006 WL 1005041, (S.D. Ind. April 13, 2006) .............. 33

*Castor v. U.S.*,
883 F.Supp. 344 (S.D. Ind. 1995) .................................................................................... 4

*Chu v. Sabratek Corp.*,
100 F.Supp.2d 815 (N.D.Ill.2000) .................................................................................. 27

*Circle Ctr. Dev. Co. v. Y/G Ind., L.P.*,
762 N.E.2d 176 (Ind. Ct. App. 2002) ............................................................................. 22

*Collins v. Sparacio*,
No. 03 C 0064, 2003 WL 21254256 (N.D. Ill., May 30, 2003) ........................................ 3

*Conley v. Gibson*,
355 U.S. 41 (1957) ............................................................................................................ 3

# Table of Authority

*Contrast Goren v. New Vision Int'l, Inc.*,
156 F.3d 721 (7th Cir. 1998) ....................................................... 25

*Dawson v. Gen'l Motors Corp.*,
977 F.2d 369 (7th Cir. 1992) ....................................................... 34

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005).......................................................... 31, 32

*F. McConnell & Sons, Inc. v. Target Data Sys., Inc.*,
84 F. Supp. 2d 980 (N.D. Ind. 2000) ............................................ 33

*Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*,
412 F.3d 745 (7th Cir. 2005) ......................................................... 4

*Fimbal v. DeClark*,
695 N.E.2d 125 (Ind. Ct. App. 1998)............................................... 8

*First Bank of Whiting v. Schuyler*,
692 N.E.2d 1370 (Ind. Ct. App. 1998) ............................................. 8

*Fla. State Bd. of Admin v. Green Tree Fin. Corp.*,
270 F.3d 645 (8th Cir. 2001) ....................................................... 20

*Friedman v. Rayovac Corp.*,
295 F. Supp. 2d 957 (W.D. Wis. 2003) .......................................... 25

*Grinding Co., Inc. v. Spitz*,
976 F.2d 1016 (7th Cir. 1992) ..................................................... 24

*In re Anicom Inc. Sec. Litig.*,
No. 00 C 4391, 2001 WL 536066, (N.D. Ill. May 18, 2001) ............... 26

*In re Gilat Satellite Networks. Ltd.*,
No. CV-02-1510, 2005 WL 2277476. (E.D.N.Y. Sept. 19, 2005) ......... 29

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F.Supp.2d 620 (E.D.Va. 2000) .............................................. 29

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)......................................................... 26

*In re Telxon Corp. Sec. Litig.*,
133 F. Supp. 2d 1010 (N.D. Ohio 2000)......................................... 29

*Indiana Bank and Trust Co. of Martinsville, Ind. v. Perry*,
467 N.E.2d 428 (Ind. Ct. App. 1984).............................................. 8

# Table of Authority

*Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.*,
   254 F. Supp. 2d 1028 (N.D. Ill. 2003) .............................................................. 25

*Jackson v. E.J. Brach Corp.*,
   176 F.3d 971 (7th Cir. 1999) ......................................................................... 3

*Jepson, Inc. v. Makita Corp.*,
   34 F.3d 1321 (7th Cir. 1994) ......................................................................... 5

*Johnson v. Revenue Mgmt. Corp.*,
   169 F.3d 1057 (7th Cir. 1999) ....................................................................... 4

*Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*,
   237 F.R.D. 173 (N.D. Ill. 2006) ................................................................ 4, 24

*Levenstein v. Salafsky*,
   164 F.3d 345 (7th Cir. 1998) ......................................................................... 3

*Lincoln Nat'l Life Ins. Co. v. Donaldson, Lufkin & Jenrette Securities Corp.*,
   9 F. Supp. 2d 994 (N.D. Ind. 1998) ............................................................... 3

*Lukowsky v. Shalit*,
   110 A.D.2d 563 487 N.Y.S.2d 781, 785 (1st Dep't 1985) ............................. 23

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ................................................................. passim

*Medtech Corp. v. Indiana Ins. Co.*,
   555 N.E.2d 844 (Ind. Ct. App. 1990) ........................................................... 22

*Midwest Grinding Co., Inc. v. Spitz*,
   976 F.2d 1016 (7th Cir. 1992) ................................................................. 4, 24

*Moffett v. Gene B. Glick Co., Inc.*,
   604 F.Supp. 229 (D. Ind. 1984) ................................................................... 31

*Montgomery Ward & Co., Inc. v. Tackett*,
   323 N.E.2d 242 (Ind. Ct. App. 1975) ........................................................... 21

*Morse v. Abbot Labs.*,
   756 F. Supp. 1108 (N.D. Ill. 1991 ................................................................ 25

*Page Two, Inc. v. P.C. Mgt, Inc.*,
   517 N.E.2d 103 (Ind. Ct. App. 1987) ........................................................... 34

*PR Diamonds Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ....................................................................... 29

# Table of Authority

*Reese v. Hammer Financial Corp.*,
    No. 99 C 0716, 1999 WL 1101677 (N.D. Ill. Nov. 30, 1999) ............................................ 3

*Reeve v. Georgia-Pacific Corp.*,
    510 N.E.2d 1378 (Ind. Ct. App. 1987) ............................................................................ 21

*Rehm v. Eagle Fin, Corp.*,
    954 F. Supp. 1246 (N.D. Ill. 1997) ................................................................................ 27

*Rochester Bridge Co. v. McNeil*,
    122 N.E. 662 (Ind. 1919) .................................................................................................. 8

*Rothe v. Revco D.S., Inc.*,
    148 F.3d 672 (7th Cir. 1998) ......................................................................................... 33

*Rudolph v. Turecek*,
    240 A.D.2d 935, 658 N.Y.S.2d 769, 771 (1st Dep't 1997) ............................................ 23

*Sakhrani v. Brightpoint, Inc.*,
    No. IP99-0870-C-H/G, 2001 WL 395752 (S.D. Ind. Mar. 29, 2001) ............................. 29

*Scott v. Bodor, Inc.*,
    571 N.E.2d 313 (Ind. Ct. App. 1991) ............................................................................ 20

*Sears v. Likens*,
    912 F.2d 889 (7th Cir. 1990) ......................................................................................... 25

*Shields v. Citytrust Bancorp. Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ........................................................................................... 27

*SMC Corp. v. PeopleSoft USA Inc.*,
    No. 1:00-CV-01095-LJM-VS, 2004 WL 253861 (S.D. Ind. Oct. 12, 2004) ................... 33

*Sriver v. Maley*,
    151 N.E.2d 518 (Ind. Ct. App. 1958) ............................................................................ 23

*SS&J Morris, Inc. v. Mahoney Cohen & Co.*,
    264 A.D.2d 343 694 N.Y.S.2d 60, 61 (1st Dep't 1999) ................................................. 23

*Stavros v. Exelon Corp.*,
    266 F.Supp.2d 833 (N.D. Ill. 2003) ............................................................................... 28

*Steinhardt Group, Inc. v. Citicorp*,
    272 A.D.2d 255 708 N.Y.S.2d 91, 93 (1st Dep't 2000) ................................................. 23

*Streeval v. State*,
    241 N.E.2d 255 (Ind. 1968) ........................................................................................... 32

*Takara Trust v. Molex, Inc.* .................................................................................................... 30

*Thompson v. Best*,
 478 N.E.2d 79 (Ind. Ct. App. 1985).................................................................................. 8

*Towers Fin. Corp. v. Solomon*,
 126 F.R.D. 531 (N.D. Ill. 1989)....................................................................................... 4

*United States v. One Parcel of Land Located at 7326 Highway 45 North*,
 965 F.2d 311 (7th Cir. 1992) ........................................................................................... 7

*Utica Mutual Ins. Co. v. Vigo Coal Co., Inc.*,
 393 F.3d 707 (7th Cir. 2004) (applying Indiana law) ..................................................... 19

*Vigortone AG Prods. Inc. v. PM AG Prods., Inc.*,
 316 F.3d 641 (7th Cir. 2003) ......................................................................................... 22

*Williams v. Younginer*,
 851 N.E.2d 351 (Ind. Ct. App. 2006)............................................................................... 8

*Winarski v. Nannenga*,
 No. 2:04-CV-390RM, 2005 WL 1221594, (N.D. Ind. May 19, 2005)............................... 3

*Wisconics Eng'g Inc. v. Fisher*,
 466 N.E.2d 745 (Ind. Ct. App. 1984)............................................................................. 23

*Zic v. Italian Gov't Travel Office*,
 130 F. Supp. 2d 991 (N.D. Ill. 2001) ............................................................................... 3

**Statutes**

15 U.S.C. §§ 78u-4(b)........................................................................................................ 1, 5

**Other Authorities**

Fed. R. Civ. P. 8 ................................................................................................................... 31

Fᴇᴅ. R. Cɪᴠ. P. 9(b)................................................................................................................ 4

# I.    INTRODUCTION

The counterclaim defendants' (hereafter "Controlling Sellers'") motion to dismiss counterclaim plaintiff KIK International LLC's ("KIK") counterclaims should be denied.  KIK's common-law fraud, Indiana Crime Victims Relief Act ("ICVRA"), Rule 10b-5, and declaratory judgment counterclaims are each legally and factually sufficient -- both as originally pled, and as re-pled in the amended counterclaim recently filed by KIK.  Controlling Sellers' contrary arguments are without procedural or substantive merit.

Procedurally, the Controlling Sellers' arguments improperly ignore and mischaracterize the well-pleaded allegations of KIK's counterclaims and the reasonable inferences that must be drawn from those allegations, the Controlling Sellers improperly reference and rely on documents outside of the pleadings that are not central to KIK's pled counterclaims, and the Controlling Sellers even improperly invite the Court to resolve disputed factual inferences drawn from documentary evidence that is not properly before the Court -- none of which can support dismissal pursuant to Rule 9(b),[1] Rule 12(b)(6), or the Private Securities Litigation Reform Act of 1995 ("PSLRA"), codified as amended, at 15 U.S.C. §§ 78u-4(b) *et seq.*

Substantively, the Controlling Sellers also misstate applicable law, and they misapply that law to the well-pleaded allegations of KIK's counterclaims.

***First***, as regards KIK's common-law fraud, ICVRA, and Rule 10b-5 counterclaims, KIK has alleged with sufficient particularity the who, what, where, when, why, and how of the Controlling Sellers' fraud, IVCRA violations, and securities fraud.  These counterclaims are pled with the particularity required by Rule 9(b), the Rule 10b-5 counterclaims satisfy the additional

---

[1]    All "Rule" references herein are to the Federal Rules of Civil Procedure unless indicated otherwise.

pleading requirements of the PSLRA, and the ICVRA counterclaims are predicated on otherwise sufficient allegations.

*Second*, KIK's declaratory judgment counterclaims against Controlling Sellers Bachman and Theroux (the "Employees") also are sufficient as pled. The Employees wrongly attempt to import common-law definitions of the contractual term "successor-in-interest," when, in fact, the relevant contracts themselves specifically and unambiguously define such a "successor-in-interest" to include KIK. Moreover, even if the Employees' reading of the relevant contracts were reasonable, that would merely establish that those contracts are ambiguous as to assignment (as KIK's reading is at least equally reasonable), and such an ambiguity cannot be resolved against KIK on a motion to dismiss. Further, even if the Employees' assignment arguments had merit, KIK has alleged that each of the Employees waived any objection to the assignment by failing to object to the same after KIK invited each of the Employees to advise KIK of any information the Employees wished KIK to consider before it made a decision as to whether to terminate or continue their employment. At the very least, such waiver issues again raise issues of fact that cannot be decided against KIK on a motion to dismiss.

*Finally*, were the Court to dismiss any of KIK's counterclaims on the technical pleading grounds that the Controlling Sellers urge, then the Court should at least grant KIK leave to re-plead any such counterclaims to address any such technical pleadings defects.

## II.    APPLICABLE STANDARDS

As this Court has stated, "[a] Rule 12(b)(6) motion to dismiss challenges the sufficiency of the complaint, not its underlying merits, and the court must accept all factual allegations in the complaint as true and draw all reasonable inferences from those facts in favor of the plaintiffs." *Winarski v. Nannenga*, No. 2:04-CV-390RM, 2005 WL 1221594, at *3 (N.D. Ind. May 19, 2005) (citation omitted); *accord Jackson v. E.J. Brach Corp.,*176 F.3d 971, 977-78 (7th Cir. 1999) (same). Accordingly, "[d]ismissal under Rule 12(b)(6) is proper only if it appears beyond doubt that the plaintiff can prove no set of facts entitling him to relief." *Winarski*, 2005 WL 1221594, at *3 (citations omitted); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (same).

It is equally well established that in deciding a Rule 12(b)(6) motion, the Court should not refer to and rely on documents outside of the challenged pleading that are not central to the claims asserted in that pleading, even if those documents are central to the defenses the movant is asserting. *See, e.g.*, *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998) (holding it was improper to consider material attached to motion to dismiss where only conclusory assertion of centrality).[2] But even if materials beyond the pleadings are considered on the theory that they essentially have been incorporated into the pleading by reference, they too must be construed in the reasonable manner most favorable to the non-movant. *See, e.g.*, *Castor v. U.S.*, 883 F.Supp.

---

[2]    *See also Brugos v. Nannenga*, No. 2:03-CV-547 RM, 2005 WL 3730317, at *4 (N.D. Ind. Dec. 5, 2005) refusing to consider agreement outside of pleading that was not central to securities claim in ruling on motion to dismiss); *Lincoln Nat'l Life Ins. Co. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 9 F. Supp. 2d 994, 999 (N.D. Ind. 1998) (excluding disclosure statement attached to motion to dismiss where document was central to defenses but not plaintiff's claims); *Collins v. Sparacio*, No. 03 C 0064, 2003 WL 21254256, at * 2 (N.D. Ill., May 30, 2003) (excluding defendant's attachments to motion to dismiss where, *inter alia*, "this is not a contract case and, more than anything, these documents supply [defendant's] defense to [plaintiff's] claims and not the foundation for [plaintiff's] … claims."); *Zic v. Italian Gov't Travel Office*, 130 F. Supp. 2d 991, 994-95 (N.D. Ill. 2001) (excluding documents attached by defendant in its motion to dismiss despite the fact that those documents were referenced by plaintiff in his complaint); *Reese v. Hammer Financial Corp.*, No. 99 C 0716, 1999 WL 1101677 at * 2-3 (N.D. Ill. Nov. 30, 1999) (excluding document attached to motion to dismiss where document that defendant sought to admit was only "central" to its defenses).

344, 348 n. 4 (S.D. Ind. 1995) (where the court agreed to consider materials submitted with movant's motion to dismiss but stated it would construe those materials most favorably to the non-movants). Disputed inferences of fact drawn from such extraneous material cannot be the basis for dismissal pursuant to Rule 12(b)(6).  *See, e.g., Johnson v. Revenue Mgmt. Corp.* 169 F.3d 1057, 1059 (7th Cir. 1999) ("[A]ssessing factual support for a suit is not the office of Rule 12(b)(6).").

Rule 9(b) further requires that "the circumstances constituting fraud … shall be stated with particularity."  Fᴇᴅ. R. Cɪᴠ. P. 9(b).  "In the Seventh Circuit, a [counterclaimant] who provides a 'general outline of the fraud scheme' sufficient to 'reasonably notify the [counter-defendants] of their purported role' in the fraud satisfies Rule 9(b)."  *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 237 F.R.D. 173, 175 (N.D. Ill. 2006) (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)).

In deciding whether a counterclaim is pled with the particularity required by Rule 9(b), the Court should not view the allegations in isolation, but should instead consider the counterclaim "as a whole."  *Towers Fin. Corp. v. Solomon*, 126 F.R.D. 531, 535 (N.D. Ill. 1989); *accord Brugos v. Nannenga*, No. 2:03-CV-547 RM, 2005 WL 3299506, at *8 (N.D. Ind. Dec. 5, 2005) ("When the court considers all the specific allegations contained in the complaint, though, the complaint adequately alleges the who, what, when, and where of the alleged fraud….  While '[t]he particulars of the charge of fraud would be easier to grasp if the acts, the times, the concealment, and a single defendant were placed in a single paragraph ... [so] long as those data are somewhere in the complaint-and they are-Rule 9(b) is satisfied.'") (quoting *Fidelity Nat'l Title Ins. Co. of New York v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 749 (7th Cir. 2005)). The same collective approach should be employed in evaluating the sufficiency of securities

claims subject to the PSLRA. *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 601 (7th Cir. 2006) *cert. granted*, 2007 WL 30549, 75 U.S.L.W. 3207 (Jan. 5, 2007). Regardless, "[s]pecificity requirements may be relaxed … when the details are within the defendant's exclusive knowledge." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994).

Under the PSLRA, KIK's Rule 10b-5 counterclaim must, *inter alia*, further plead: (1) each statement and omission that was misleading; (2) the reason why each statement and omission was misleading; (3) the particular facts giving rise to a strong inference of scienter with respect to each of the Sellers; and (4) that KIK was in fact injured as a proximate result of Sellers' misleading statements and omissions. 15 U.S.C. § 78u-4(b)(1)-(2), (4); *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 649 (7th Cir. 1997).

## III. BACKGROUND

This lawsuit grows out of plaintiffs' sale to KIK of all of the issued and outstanding stock of third-party APG, Inc. (the "APG Shares") pursuant to the SPA for the price of $73 million. (Countercl. ¶¶ 1-64.) KIK was fraudulently induced to enter into the SPA and to pay $73 million for the APG Shares by the Controlling Sellers': (1) misleading statements and omissions respecting the financial statements, financial condition, and financial performance of APG (Countercl. ¶¶ 66-74) (hereafter the "Financial Statement Representations"); (2) misleading statements and omissions respecting APG's relationship with and sales to one of its most important customers, Connetics (Countercl. ¶¶ 75-85) (hereafter the "Connetics Representations"); and (3) misleading statements and omissions respecting a major capital

improvement project that was ongoing at APG as of the date of the sale (Countercl. ¶¶ 86-97) (hereafter the "Distribution Center Representations").[3]

## A. The Controlling Sellers.

The Controlling Sellers are: (1) Satish Shah ("Satish"); (2) the eponymous Satish Shah Revocable Trust ("SSRT"), whose sole trustee has at all relevant times been Satish; (3) Frederick Bachman; and (4) Robert Theroux. (Countercl. ¶¶ 12-17.) Each of the Controlling Sellers was a party to and signed the SPA. (Compl., Ex. 1 at 1, 60.[4]) Moreover, "[a]s a material inducement to the Buyer[5] entering into this Agreement, each of the Sellers[6] … jointly and severally represent[ed]" to KIK existing and material facts respecting the business that KIK was acquiring (hereafter "Old APG"). (*See* Compl., Ex. 1 at 7 § 3.8; *id.* at 8 § 3.9(a); *id.* at 11-12 § 3.12(m); *id.* at 16 § 3.17(c); *id.* at 17-19 §§ 3.19(h), 3.19(i), 3.19(r); *id.* at 20 § 3.21; *id.* at 28 § 3.33; *id.* at 32 § 6.2(a); *id.* at 38 §§ 7.4(c), 7.6; Countercl. ¶¶ 66-97.)

---

[3]   While KIK's amended counterclaim asserts certain additional misrepresentations, omissions, and concealment that entitle it to further recovery from the Controlling Sellers, as the Controlling Sellers' motion to dismiss does not (and could not address) these, the discussion herein is limited principally to the misrepresentations, omissions, and concealment put at issue by KIK's Counterclaim as originally pled.

[4]   The Controlling Sellers assert, and KIK agrees, that the Court may take judicial notice of the Complaint's exhibits in deciding the Controlling Sellers' Rule 12(b)(6) motion, which exhibits include the SPA (Compl., Ex. 1) and KIK's arbitration demand (Compl., Ex. 3.) (*See, e.g.,* Sellers Br. 3.) Further, as the SPA, including Attachment 3.8(b) thereto (*see* Sellers Br., Ex. 23), the Bachman and Theroux employment agreements (*see id.,* Exs. 9-10), and the related termination correspondence (*see id.,* Exs. 11-12. 14-16) are central to one or more of KIK's counterclaims, the Court also may refer to these documents in deciding the Controlling Sellers' Rule 12(b)(6) arguments. Exhibit 13 to the Controlling Sellers' Brief is not a signed copy of the actual letter sent by Bachman to KIK respecting termination of his employment. Exhibits 17-22 to the Controlling Sellers' Brief are irrelevant and should not be considered even if they are matters of public record of which the Court may take judicial notice. Finally, Exhibits 1-8 to Sellers' Brief are not central to KIK's counterclaims and therefore are not properly before the Court on Sellers' Rule 12(b)(6) arguments. However, were the Court to consider these documents and draw the reasonable favorable inferences from them to which KIK is entitled in connection with the instant motion, then each of these documents further establishes the merit and sufficiency of KIK's pled claims; none can be deemed a basis for dismissing any of KIK's counterclaims.

[5]   KIK is defined as the "Buyer" in the preamble to the SPA. (*See* Compl., Ex. 1 at 1, 60.)

[6]   The preamble to the SPA defines the "Sellers" as each of the holders of the APG Shares, which included each of the Controlling Sellers. (*See* Compl., Ex. 1 at 1.)

In addition, pursuant to the SPA, Satish was the "Sellers Representative," and, as such, "an agent for the other Sellers." (Compl., Ex. 1 at 1 (preamble).) More particularly, SPA § 2.3 provides that by separate agreement, Satish, "the Sellers' Representative[,] shall generally act for the Sellers and on behalf of the Sellers in all matters contemplated by, or connected with, this Agreement, with the same force and effect as each of the Sellers might act in person"; and it further recites that KIK, "[t]he Buyer[,] shall be entitled to rely on the full power and authority of the Sellers' Representative to act hereunder on behalf of the Sellers." (Compl., Ex. 1 at 4 § 2.3.) Hence, according to well-established agency principles, the knowledge and conduct of Satish (the "Sellers Representative") is imputed to Bachman and Theroux (two of the "Sellers"). *See, e.g.*, *United States v. One Parcel of Land Located at 7326 Highway 45 North*, 965 F.2d 311, 316 (7th Cir. 1992).

Moreover, the SPA defined "Sellers' Knowledge," a qualifier used in connection with certain of the representations at issue, as, *inter alia*, "the actual knowledge of Satish Shah, Robert E. Theroux, … and Frederick H. Bachman … **and** knowledge which such Persons would reasonably be expected to have after making reasonable inquiries in the circumstances." (Compl., Ex. 1 at 56 § 11.8(pp) (emphasis added).) Thus, representations of the Controlling Sellers in the SPA that contain such a "Knowledge" qualifier at least implicitly represented that the Controlling Sellers made reasonable inquiries regarding the relevant circumstances before making the representation in the SPA and that the representations were based on the knowledge the Controlling Sellers acquired as a result of such inquiry.

Further, in SPA § 7.6, Satish, as the Sellers' Representative (and therefore for all "Sellers," including the Controlling Sellers), covenanted that "[b]etween the date of this Agreement and the Closing, the ***Sellers Representative*** shall keep … the Buyer[] fully and

promptly informed of … all material information relating to the Business and its prospects of which any of the Sellers or the Acquired Companies become aware." (Compl., Ex. 1 at 38 § 7.6 (emphasis added).) Thus, from and after at least September 19, 2005, Satish had an affirmative obligation to disclose to KIK all material information relating to the Old APG and its prospects of which Satish, Theroux, Bachman, Old APG, or any of the other former shareholders became aware. And, because Satish, as the Sellers' Representative, was the agent of Theroux and Bachman, any failures by Satish to disclose material information relating to Old APG and its prospects to KIK are equally chargeable to Bachman and Theroux.[7]

Moreover, prior to execution of the SPA, under the common law that Controlling Sellers assert is governing here,[8] each of the Controlling Sellers also had a duty to disclose facts to KIK that were necessary to correct misleading partial disclosures by the Controlling Sellers or that were required to be disclosed in response to direct inquiries that KIK made. *See, e.g.*, *First Bank of Whiting v. Schuyler*, 692 N.E.2d 1370, 1373 (Ind. Ct. App. 1998); *Indiana Bank and Trust Co. of Martinsville, Ind. v. Perry*, 467 N.E.2d 428, 431 (Ind. Ct. App. 1984); *Fimbal v. DeClark*, 695 N.E.2d 125, 126 (Ind. Ct. App. 1998); *Rochester Bridge Co. v. McNeil*, 122 N.E. 662, 664 (Ind. 1919); *Thompson v. Best*, 478 N.E.2d 79, 84 (Ind. Ct. App. 1985).

Satish was undoubtedly appointed as the Sellers' Representative because he and the SSRT he controlled were the two largest shareholders of the Old APG, respectively owning

---

[7] A contractual relationship can give rise to a duty to disclose and the breach of that duty can amount to constructive fraud. *See Williams v. Younginer*, 851 N.E.2d 351, 358 n.2 (Ind. Ct. App. 2006); *Abbott v. Bates*, 670 N.E.2d 916, 923 n.4 (Ind. Ct. App. 1996).

[8] KIK assumes *arguendo* for the purposes of the instant motion that Indiana law is controlling as to KIK's common-law fraud claims, but does not concede that Indiana common law (as opposed to Canadian law) is governing as to KIK's fraud claims. Contrary to the assertions of Controlling Sellers (*see* Sellers Br. at 13), SPA § 11.6 does not purport to dictate the law applicable to fraud claims, but states only that the SPA shall be construed and governed in accordance with Indiana law. (Compl., Ex. 1 at 50 § 11.6.)

43.44% and 33.26% of the APG Shares.  (Countercl. ¶¶ 13-14.)  Thus, both individually and as the sole trustee of the SSRT, Satish directly controlled 76.7% of the issued and outstanding shares of Old APG.  (Countercl. ¶ 15.)

None of the minority shareholders of Old APG owned or controlled even a tenth of the APG Shares that Satish owned and controlled.  Controlling Sellers Bachman and Theroux collectively owned 7.25% of the shares of the Old APG.  (Countercl. ¶¶ 16-17.)  The remaining stock of Old APG was distributed among and owned by the three plaintiffs who are not currently parties to the Counterclaim (none of whom owned more than 6.65% of the APG Shares (Compl., Ex. 3 ¶¶ 15, 16, 21)), the two largest of whom (collectively accounting for an additional 13.3% of the shares of Old APG (*id.*)) were the wife and son of Satish (*id.*).  Because it is not unreasonable to infer in such circumstances that Satish at least indirectly controlled the APG Shares of both his wife and son, it is further reasonable to infer that Satish directly and indirectly controlled approximately 90% of the issued and outstanding shares of the Old APG.  Therefore, collectively, the Controlling Sellers directly and indirectly controlled in excess of 97% of the issued and outstanding shares of Old APG, and more than 97% of the benefit accruing to the Old APG shareholders as a result of the Controlling Sellers' fraudulent misrepresentations, omissions, and concealment ultimately redounds to the direct benefit of Satish, his revocable trust, his immediate family, Bachman, and Theroux.

Not only was Satish the dominant and controlling owner of Old APG, he also was APG's highest ranking officer.  Specifically, Satish was a director of APG, the president and chief executive officer ("CEO") of APG, and a director and the CEO of APG affiliates Accra-Pac and Kem Crest.  (Countercl. ¶ 13.)  Further, both Bachman and Theroux held offices subordinate to the offices held by Satish (Countercl. ¶¶ 16-17), and, therefore, it is further reasonable to infer

that Bachman and Theroux reported to and, at all relevant times, acted under the direction and control of Satish and with his knowledge and consent.

While Satish held the highest office, Bachman also held an important office in Old APG -- that of Chief Financial Officer. (Countercl. ¶ 17.) As CFO of Old APG, Bachman was responsible for, and, one may reasonably infer from the well-pleaded allegations of KIK's Counterclaims, the author of, many (if not all) of the financial statements put at issue by KIK's Counterclaims. (Countercl. ¶¶ 25, 28-29, 32-38, 47-50, 52-54, 56-57, 59, 62-64, 66-73.)

Similarly, Theroux also held an important office in the principal operating subsidiary of Old APG, Accra-Pac. (Countercl. ¶ 16.) Specifically, Theroux was Accra-Pac's president and chief operating officer ("COO"). (*Id.*) As such, it is reasonable to infer that he was aware of the problems that had arisen with a significant capital improvement project for Old APG that was ongoing at the time of the sale of his APG Shares to KIK, and it is further reasonable to presume that Theroux was aware of the decline in manufacturing activity for Connetics in August and September 2005 given that he was responsible for overseeing the operations of Accra-Pac, which would include matters such as the scheduling of production runs for Connetics. Also, as set forth in KIK's arbitration demand, Theroux and Bachman played a leading role in improperly invoicing and accelerating receivables for Connetics on the eve of closing. (Compl., Ex. 3 ¶¶ 88-92.)

**B.      The Controlling Sellers' Statements And Omissions.**

KIK's Counterclaims identify with particularity each of the fraudulent misrepresentations and omissions made by each of the Controlling Sellers for which KIK seeks to recover. The fraudulent misrepresentations were made by each of the Controlling Sellers to KIK in the SPA, and the omissions were made by each Controlling Seller's failure to disclose certain information to KIK and each Controlling Seller's affirmative attempts to conceal information from KIK that

the SPA and the applicable common law obligated each of them to disclose to KIK. (Countercl. ¶¶ 66-97) The Controlling Sellers' SPA representations at issue here were made both on September 19, 2005 (the date the SPA was signed), and again on October 21, 2005 (the date the sale of the APG Shares pursuant to the SPA closed). (Compl., Ex. 1 at 28 § 3.33; *id.* at 32 § 6.2(a).)

The specific SPA representations and SPA-related omissions on which KIK's Counterclaims were originally based are:

**The Financial Statement SPA Representations**

- "Each of the Financial Statements[9] is

  - [1] consistent with the books and records of the Acquired Companies[10] (which, in turn, are accurate and complete in all material respects) and

  - [2] fairly presents the financial condition of the Acquired Companies as of its respective date, and the results of operations of the Acquired Companies, for the periods related thereto, in each case in accordance with GAAP consistently applied among the periods which are the subject of the Financial Statements … and

  - [3] … none of such Unaudited Financial Statements is materially misstated."

(Compl., Ex. 1 (SPA) at 7 § 3.8; Countercl. ¶¶ 66-68.)

**The Connetics SPA Representations**

- "[S]ince … [September 30, 2004], the Acquired Companies

  - [4] have conducted the Business in the ordinary course consistent with past practices."

---

9   The SPA defines such "Financial Statements" to include the "Unaudited Financial Statements," which in turn are defined as the unaudited financial statements for APG for the first ten months of fiscal year 2005. (*See* Compl., Ex. 1 at 7 § 3.8(b).)

10   The SPA defines the "Acquired Companies" to include the "Company and any Subsidiary of the Company." (*See* Compl., Ex. 1 at 50 § 11.8(b).) In turn, the SPA defines "Company" to mean "APG, Inc." (*see id.* at 1 (preamble)) and defines "Subsidiary" to mean any entity controlled or owned by another (*see id.* at 56 § 11.8(qq)). Thus, references to "Acquired Companies" in the SPA include APG, Inc. and its wholly-owned subsidiaries, Accra-Pac and Kem Krest.

- "Without limiting the generality of the foregoing, … since [September 30, 2004] … there has not been …

    - [5] Any material change … in the purchases, orders, buying patterns, payment practices, or, to Seller's Knowledge, the financial condition or prospects of any customer of the Acquired Companies….

    - [6] [N]o material … customer … to the Seller's Knowledge, has… during the last twelve (12) months, decreased or limited materially or threatened to decrease or limit materially, … its usage of the products of any of the Acquired Companies. ….

    - [7] [N]one of the Sellers nor any of the Acquired Companies has any reason to believe that, any of such … customers intends to cancel or otherwise modify its relationship with any of the Acquired Companies…."

(Compl., Ex. 1 at 18-19 § 3.19(r); Countercl. ¶¶ 83-85.)

**The Distribution Center SPA Representations**

- [8] "[S]ince [September 30, 2004] … there has not been any … [c]apital expenditures or commitments therefor by the Acquired Companies in excess of $50,000 in the aggregate" (Compl., Ex. 1 at 17-18 § 3.19(i); Countercl. ¶¶ 88-89, 95)

- [9] "Other than the items listed on Schedule 3.17, there is no other intellectual property of … any third party that is necessary to the conduct of the Business … by the Acquired Companies." (Compl., Ex. 1 at 16 § 3.17(c); Countercl. ¶¶ 91, 95)

- [10] "Except as listed or described on Schedule 3.12, none of the Acquired Companies is a party to or bound by … Any Contract … under which any of the Acquired Companies (i) has granted or received (or has the option to grant or receive) a License, (ii) has assigned or otherwise transferred or received any intellectual property right from any third party, or (iii) is or may be obligated to pay … in an amount in excess of $50,000…." (Compl., Ex. 1 at 11-12 § 3.12(m); Countercl. ¶¶ 91, 95)[11]

- [11] The certification on behalf of the Controlling Sellers at closing that "[t]he Acquired Companies and the Sellers … have performed and complied with, in all material respects, all covenants [including SPA § 7.6] … required by this Agreement

---

[11] *See also* Compl., Ex. 1 at 20 § 3.21 ("No loss or expiration of any License is pending or Threatened or reasonably foreseeable (including, without limitation, as a result of the transactions contemplated hereby) other than expiration in accordance with the terms thereof, which terms do not expire as a result of the consummation of the transactions contemplated hereby."). *See also* Countercl. ¶ 95 ("In intentionally concealing this change-of-control provision in the license … Sellers made misrepresentations *in at least* SPA §§ 3.12(m), 3.17, 3.19(i), 7.5 & 7.6.") (emphasis added).

to be performed or complied by any of them on or prior to closing." (Compl., Ex. 1 at 32 § 6.2(a).)

In addition to the aforementioned misleading statements, KIK also has alleged with specificity a number of materially misleading statements and omissions made by each of the Controlling Sellers, commencing in late August 2005 and continuing through the close of the sale of the APG Shares on October 21, 2005, including:

### The August Financial Statement Representations And Omissions

- [12] In response to a direct inquiry from KIK prior to the signing of the August 26, 2005 letter agreement and subsequent to receiving the Initial Financial Statements on August 25, 2005, each of the Controlling Sellers (directly or through an agent) affirmatively misrepresented to KIK that APG's financial results for the first three weeks of August 2005 were unavailable (Countercl. ¶¶ 28-30; Am. Countercl. ¶¶ 28-30);

- [13] Each of the Controlling Sellers (directly or through an agent) represented to KIK on August 25, 2005 that the best and most accurate projection of APG's earnings before interest, taxes, depreciation, and amortization ("EBITDA") for the month of August 2005 was set forth in the financial statements Controlling Sellers delivered to KIK on that date, while each of the Controlling Sellers omitted to disclose to and concealed from KIK that interim financial statements for August 2005 and revised projections for August 2005 EBITDA had been circulated that very same day to each of the Controlling Sellers showing that Old APG was expected to generate substantially less EBITDA for the month of August 2005 (Countercl. ¶¶ 32-36; Am. Countercl. ¶¶ 32-36);

### The Due Diligence Representations And Omissions

- [14] Each of the Controlling Sellers (directly or through an agent) affirmatively represented to KIK that the need to resume negotiations with another prospective purchaser required the completion of due diligence by KIK on an accelerated and compressed schedule, while each of the Controlling Sellers omitted to disclose to and concealed from KIK that before KIK's due diligence had even begun the Controlling Sellers' counsel had advised this other prospective purchaser that the shareholders of Old APG were no longer interested in selling to this prospective purchaser (Countercl. ¶¶ 39-42; Am. Countercl. ¶¶ 39-42);

### The FY2005 EBITDA Representations And Omissions

- [15] In response to direct inquiries by KIK and less than two business days before the SPA was signed and 15 days before the close of Old APG's fiscal year 2005 ("FY2005"), Bachman (with the knowledge and consent of Satish and Theroux)

13

affirmatively represented to KIK that APG was continuing to expect that it would generate approximately $12 million in EBITDA for FY2005, while each of the Controlling Sellers failed to disclose to and concealed from KIK that interim financial results for September 2005 and revised projections for September 2005 EBITDA had been circulated the day before to each of the Controlling Sellers showing that Old APG expected to generate substantially less EBITDA for the month of September 2005 (Countercl. ¶¶ 49-54; Am. Countercl. ¶¶ 49-54)

**The September Financial Performance Representations And Omissions**

- [16] In explaining the subpar results for August 2005 to KIK, Bachman and Theroux (with the knowledge and consent of Satish) affirmatively misrepresented to KIK that the forecast sales for August 2005 that did not ship in that month had been shipped or were scheduled to be shipped in the month of September 2005, while each of the Controlling Sellers omitted to disclose to and concealed from KIK that none of the high-margin Connetics sales had shipped in September 2005 and that none was expected to ship in the final weeks remaining in FY2005 given an agreement Satish had reached to shift sales into the first three quarters of calendar year 2005 and given the recent termination of Connetics' newly-appointed distributor (Countercl. ¶¶ 50-54; Am. Countercl. ¶¶ 50-54);

- [17] Each of the Controlling Sellers omitted to disclose to and concealed from KIK Old APG financial statements for the first three weeks of September 2005 when the same were circulated to each of the Controlling Sellers by Bachman on September 20, 2005, which material financial information respecting Old APG's business at least Satish, as Bachman's and Theroux's and the other Sellers' Representative, had covenanted he would disclose to KIK pursuant to SPA § 7.6, and which Bachman and Theroux also were obligated to disclose to KIK to correct the deliberate misimpression created by Bachman's reassurances to KIK only five days earlier respecting the expected EBITDA that Old APG would generate in FY2005 (Countercl. ¶¶ 56-58; Am. Countercl. ¶¶ 56-58);

**The FY2005 Financial Statement Representations And Omissions**

- [18] Each of the Controlling Sellers omitted to disclose to and concealed from KIK that inventory reserves (and therefore costs of sale, and therefore EBITDA) for Old APG for FY2005 were understated, perhaps by as must as $500,000 or more, which material financial information respecting Old APG's business at least Satish, as Bachman's and Theroux's agent, had covenanted that he would disclose to KIK pursuant to SPA § 7.6, and which Bachman and Theroux also were obligated to disclose to KIK to correct the deliberate misimpressions created by both Bachman's reassurances to KIK only five days earlier respecting the expected EBITDA that APG would generate in FY2005 and each of the Controlling Sellers' representations six days earlier that the unaudited financial statements for Old APG for the first ten months of FY2005 were not materially misstated and fairly presented in all respects the financial condition and results of operation of APG (Countercl. ¶¶ 59-60; Am. Countercl. ¶¶ 59-60);

- [19] With the knowledge and consent of Satish and Theroux, Bachman delivered financial statements for FY2005 to KIK on the eve of closing that represented that Old APG had generated in excess of $12 million in EBITDA and further represented that a number of year-end and other accounting adjustments were properly made in arriving at these numbers, while each of the Controlling Sellers omitted to disclose to and concealed from KIK (1) Bachman's expectation that the inventory reserves for these financial statements were as much as $500,000 too low (and therefore the EBITDA was as much as $500,000 too high), (2) Connetics receivables had been improperly accelerated in October 2005 and other sales booked as income in September 2005 that should not have been recorded as income in FY2005, and (3) the results for the first ten months of FY2005 overstated EBITDA by more than $2 million due to a failure to appropriately reserve for inventory, the failure to accrue for recurring self-insurance and leasing costs as required by GAAP, and the booking of nearly $500,000 in accounts receivable that did not represent actual sales of goods or billable services (Compl., Ex. 3 ¶¶ 88-92; Countercl. ¶¶ 3, 62-64, 70-73; Am. Countercl. ¶¶ 3, 62-64, 70-73.)[12]

## C.  Controlling Sellers' Statements And Omissions Were False And Misleading.

The reasons why each of the foregoing statements and omissions by each of the Controlling Sellers were misleading are set forth in KIK's Counterclaims at length.

---

[12] Controlling Sellers wrongly assert that "KIK admits" that: (1) APG's FY2005 EBITDA was over $12 million (Countercl. ¶ 63); (2) it was KIK that accelerated due diligence (Sellers Br., Ex. 1.); (3) Controlling Sellers provided accurate financials to KIK for the first ten months of FY2005 before KIK entered into the August 26, 2005 Letter Agreement (Countercl. ¶ 28); (4) Controlling Sellers provided actual August 2005 financial statements to KIK before KIK entered into the SPA (Countercl. ¶ 47); (5) Controlling Sellers provided actual September 2005 financial statement to KIK before the sale closed (Countercl. ¶ 62); and (6) after a year of ownership of APG, "KIK still has no basis for asserting that the August and September 2005 financials are incorrect" (Countercl. ¶¶ 48, 63). (*See* Sellers Br. at 6-7.) Each of these assertions is based on an interpretation of KIK's cited allegations (or documents extraneous to the pleading that are not properly considered on the instant motion) that is neither reasonable nor accords KIK the benefit of all reasonable favorable inferences, as must be done at this juncture, and that further ignores other allegations in KIK's Counterclaim that belie these very assertions. (*Compare* Countercl. ¶ 3 (FY2005 EBITDA for APG was millions less than represented), *with* Countercl. ¶ 63 (stating financial statements Controlling Sellers provided "represented that FY2005 EBITDA was some $12,201,000"); *compare* Countercl. ¶¶ 39-42 (Controlling Sellers insisted on accelerated due diligence to conceal true financial condition and performance of APG from KIK), *with* Sellers Br. at 6 (claiming that because due diligence deadline set forth in August 26, 2005 letter agreement signed by KIK executive that is not attached to pleading and not central to KIK's claims, Court must infer from that document that KIK imposed that deadline); *compare* Countercl. ¶¶ 24-38 (Controlling Sellers provided KIK with misleading financial statements for first ten months of FY2005 to induce KIK to pursue acquisition), *with* Countercl. ¶ 28 (simply stating that initial financial statements were provided to KIK on August 25, 2005); *compare* Countercl. ¶¶ 48, 63 (indicating that KIK was provided with monthly financial statements for August and September, certain weeks of which are still under investigation by KIK), *with* Countercl. ¶¶ 3, 54, 59 (Controlling Sellers aware of problems with Connetics Sales for August and September 2005, as well as understatement of inventory reserves).)

*First*, the Financial Statement SPA Representations were false and misleading because the unaudited financial statements to which they are addressed did not in fact fairly present the financial condition and results of operation for Old APG for the first ten months of FY2005 and were in fact materially misstated in a number of respects, ultimately overstating Old APG's EBITDA for that time period alone by approximately $2.3 million, and thereby improperly inflating the price that KIK paid the Controlling Sellers for roughly 84% of the shares of Old APG by approximately $13 million. (Countercl. ¶¶ 66-74.)

*Second*, the Connetics SPA Representations were false and misleading because Satish, the Sellers' Representative and thus agent of Bachman and Theroux, reached an undisclosed agreement with Connetics to consolidate sales for calendar year 2005 into the first three quarters of that year, and because Satish also learned in August 2005 but failed to disclose to KIK that Connetics had terminated its newly-appointed distributor and therefore was effectively without a sales force, culminating in a dramatic and sustained fall-off of such sales. (Countercl. ¶¶ 75-85.) In light of these undisclosed facts, the customer relationship and sales representations Satish, Bachman, and Theroux each made in the SPA were plainly false and misleading. (Countercl. ¶¶ 75-85)

*Third*, the Distribution Center SPA Representations were false and misleading because prior to closing APG committed to undisclosed additional capital expenditures for changes to a palletizing system, the warehouse for that system, and the software to be used with the new distribution center that collectively totaled approximately $1.3 million (which it is unreasonable to infer would have escaped the attention of any of the Controlling Sellers given each's position with APG and/or Accra-Pac and their awareness of the significance of these issues to KIK). (Countercl. ¶¶ 86-97)

**Fourth**, the remaining Representations and Omissions were false and misleading for the reasons set forth above.[13]

### D. The Controlling Sellers' Scienter.

Contrary to the Controlling Sellers' assertions, KIK has alleged with particularity facts that give rise to a strong inference of scienter with respect to each of the Controlling Sellers. Specifically, KIK has alleged that in late August 2005, Satish entered into a letter agreement with KIK on behalf of all of the shareholders of APG that made unequivocally clear that KIK was pricing the APG Shares on the basis of a multiple of Old APG's EBITDA for FY2005. (Countercl. ¶ 24-25.)[14]  Notwithstanding the Controlling Sellers' awareness of this, however,

---

[13]    While the Court should not consider the same in deciding the Controlling Sellers' Rule 12(b)(6) arguments for dismissal, Exhibits 2 and 3 to their brief are, respectively, a page of the first set of financial statements that were provided to KIK by Sellers on August 25, 2005, and the August 25, 2005 email from Bachman. (*See* Sellers Br., Exs. 2-3.)  The "Aug-05" column of Exhibit 2 projects "Ebitda" for the month of August 2005 of "$821[,000]."  The first page of Exhibit 3, the Bachman email, which reflects that it was sent at 9:48 AM on August 25, 2005, and whose subject line reads, "August Proforma -- *after* 3 weeks," states "APG Consolidated ***has*** pretax income loss of $101 compared to ***projection*** of $237 and budget of $331."  (Emphasis added).  The aforementioned numbers, in turn, are identical to those set forth in the first page of the attached financial statements, even though the title and headings of those financial statements include the word "Projection."  (Sellers Br., Ex. 3 at 2.)  On the basis of the foregoing reference to "Projections", Controlling Sellers assert that as a matter of law the Court must rule that all of the numbers in the financial statements accompanying Bachman's August 25, 2005 email were merely projections and not actual results for the first three weeks of August 2005 -- despite the contrary evidence set forth in Bachman's transmittal email and references to actual results elsewhere in those same financial statements. (*See, e.g.*, Sellers Br. 17.)  However, this is precisely the type of disputed factual inference that the Court may ***not*** draw in deciding a Rule 12(b)(6) motion, even assuming it were proper for the Court to consider this material outside of the pleadings in the first place -- and it is not.  For the same reasons, Controlling Sellers' assertions as to the inferences that must be drawn from Bachman's September 22, 2005 email (*see, e.g.*, Sellers Br. at 18) are, once again, improper -- both because the email itself is not properly considered in connection with the instant motion, and because different inferences favorable to KIK must be drawn at this juncture.

[14]    While the same reasonably may be inferred from the allegations of KIK's counterclaims, should the Court consider Exhibit 1 to Sellers' Brief (the August 26, 2005 letter), that document represents that Satish accepted and agreed to the option extended thereby "on behalf of APG, Inc. ***and the shareholders of APG, Inc.***" (Sellers Br., Ex.1 (emphasis added).)  Because Bachman and Theroux were both shareholders of Old APG at that time, it may fairly be inferred from this document that, *inter alia*, Satish was accepting and agreeing to the option on behalf of both Bachman and Theroux, and, further, that all three were representing in the attachment to this August 26, 2005 letter agreement that Old APG EBITDA for FY2005 was approximately $12 million, and all three were aware of KIK's pricing of the transaction on the basis of a multiple of FY2005 EBITDA.  Moreover, it is reasonable to infer that Bachman prepared the attachment to the August 26, 2005 letter given the similar nature of certain other documents that Bachman subsequently circulated by email, as well as the fact that Bachman was the Chief Financial Officer of Old APG.  (*Compare* Sellers Br. Ex. 1 at 2, *with id.* Ex. 7 at 3.)

they repeatedly lied about the existence of interim financial results, they encouraged KIK to rely on projections that they knew were outdated and unreliable, they internally projected that inventory reserves were understated (and therefore EBITDA overstated) a week after reaffirming the accuracy of their projections of FY2005 EBITDA, and they engaged in a host of other conduct and communications that give rise to a strong inference of scienter on the part of each. (Countercl. ¶¶ 24-102.)

E. **The Controlling Sellers' Misleading Statements And Omissions Proximately Caused KIK To Sustain The Losses It Seeks To Recover Here.**

Finally, contrary to the Controlling Sellers' assertions, KIK's counterclaims explain at length how each of the Controlling Sellers' misleading statements and omissions prevented KIK from obtaining an appropriate adjustment of the price and unduly inflated the price that KIK paid, computing that the total effect of these misleading statement and omission was to induce KIK to pay more than $12 million more for the shares of Old APG than it would have paid but for the Controlling Sellers' fraudulent misrepresentations, omissions, and concealment. (Countercl. ¶¶ 6, 25, 37-38, 46, 73-74, 82, 84-85, 93-95, 97.)

IV. <u>**ARGUMENT**</u>

A. **KIK's Common-Law Fraud Claims Should Not Be Dismissed.**

The Controlling Sellers assert that KIK's common-law fraud claims should be dismissed pursuant to Rule 12(b)(6) and/or pursuant to Rule 9(b). Neither assertion has merit.

*1.* *None Of KIK's Fraud Claims Is Legally Insufficient As Pled.*

*First*, the Controlling Sellers argue that certain of KIK's fraud claims should be dismissed as repackaged working capital contract claims. (*See* Sellers Br. 19-20.) Sellers are wrong.

KIK's claims based on each of the Controlling Sellers' SPA representations are not re-packaged working capital claims. As argued at length in motion papers already pending with this Court in this lawsuit, the working capital adjustment provisions of SPA § 2.2 are not applicable to any of KIK's indemnity or fraud claims, some of the consequential compensatory damages and all of the punitive damages that KIK seeks on its fraud claims are not available pursuant to a contract theory (not the least of which because the SPA caps contractual indemnity at $12 million), the SPA itself contemplates the availability of fraud claims for intentional breaches of representations set forth therein (Compl., Ex. 1 at 44 § 8.9), and breach of KIK's fraud claims requires proof of elements that are not required for working capital or indemnity claims -- *i.e.*, that each of the Controlling Sellers made the operative SPA representations falsely and/or recklessly and with the intent to mislead, and KIK justifiably relied on the same to its detriment. *See, e.g.*, *Brugos v. Nannenga*, No. 2:03-CV-547-RM, 2007 WL 79307, at *4 (N.D. Ind. Jan. 8, 2007) (denying summary judgment on fraud claim that did not completely overlap with contract claim).[15] Moreover, it is well-established that where, as here, the intentionally false contractual representations are a material inducement to the defrauded party to enter into the contract (*see* Compl., Ex. 1 at 5, Art. 3 (preamble)), then a claim of fraud is sufficiently stated. *See Am.'s Directories Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1067 (Ind. Ct. App. 2005).

---

[15] Further, the Controlling Sellers are estopped from now claiming that KIK's fraud claims are indemnity claims, for in at least two separate pleadings Sellers already have asserted that KIK's fraud claims are not arbitrable as indemnity claims. (*See* Compl. ¶ 30; Pls.' Br. in Opp. to Def.'s Mot. to Dismiss 4 & n.1.) And a party cannot "change its position on the meaning of a contract in the middle of litigation over it." *Utica Mutual Ins. Co. v. Vigo Coal Co., Inc.*, 393 F.3d 707, 716 (7th Cir. 2004) (applying Indiana law). Thus, having induced KIK to withdraw its fraud claims from arbitration and re-file them as counterclaims here, the Controlling Sellers cannot now change course and assert that such claims are, in fact, contractual indemnity claims.

**Second**, while the Controlling Sellers assert that a number of their misrepresentations are merely predictions, opinions, or expressions of value that are not actionable (*see* Sellers Br. at 14-15, 17-20), they are again mistaken.

Each of the challenged representations was composed, at least in part, of misrepresentations of past or existing facts. Indeed, it is well-established that the present features or terms of business plans or expectations are past or existing facts, not mere statements of opinion or promises of future action. *See Scott v. Bodor, Inc.*, 571 N.E.2d 313, 320-21 (Ind. Ct. App. 1991).

Thus, when the Controlling Sellers dishonestly and repeatedly represented to KIK that they expected EBITDA for FY 2005 to exceed $12 million (despite material and more recent information indicating otherwise), when they repeatedly falsely represented that no interim financial statements were available, when they falsely represented that due diligence had to be compressed due to ongoing negotiations with a third party, when they falsely represented that sales that had not shipped in August had been and would be shipped in September, when they falsely represented that the distribution center was within the budget and that they had not made any undisclosed capital commitments that in the aggregate execeeded $50,000 -- each of those representations was a fraudulent misrepresentation about the existing plans and expectations at the time it was made, and, as such, was actionable.

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Fla. State Bd. of Admin v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001); *accord Makor*, 437 F.3d at 603 (citing and quoting *Green Tree* with approval, and holding that where CEO had marketing strategy report

forecasting significant decline in sales, but nonetheless subsequently represented to public that "everything we hear from the customers indicates that our in-user demand for services continues to grow," scienter had been adequately alleged and securities fraud claim for same was sufficiently stated).[16]

Moreover, even if the misrepresentations, omissions, and concealment at issue fairly could be characterized as regarding matters of opinion or prediction, that does not establish that they are not actionable in these circumstances. While "as a general rule, mere expressions of opinion, honestly and dutifully given, do not constitute actionable fraud … this rule, by its very terms, hinges upon factual questions concerning the knowledge and motives of the person stating the opinion." *Montgomery Ward & Co., Inc. v. Tackett*, 323 N.E.2d 242, 248 (Ind. Ct. App. 1975). "The mere fact that a statement takes the form of an expression of opinion is not always conclusive, for,… it must be interpreted by the facts and surrounding circumstances shown by the complaint." *Id.* at 248-49. (quoting *Automobile Underwriters, Inc. v. Rich*, 53 N.E.2d 775, 778 (Ind. 1944)). Opinions may be actionable "where the party expressing the opinion claims or expresses a special knowledge." *Reeve v. Georgia-Pacific Corp.*, 510 N.E.2d 1378, 1383 (Ind. Ct. App. 1987).

Each of the representations the Controlling Sellers seek to characterize as an opinion was, when given, purportedly based on Controlling Sellers' special, superior, and unique knowledge of the finances and plans of APG, and their plans as owners of APG, so those misrepresentations are actionable even if they are considered to be opinions. In addition, an expression of opinion is also actionable where, as here, the person believes differently than she expresses herself at the

---

[16] It is further worth noting that there is no allegation that the Controlling Sellers made any safe-harbor disclaimers in connection with the forward-looking statements they made to KIK.

time, or where she is reckless in failing to ascertain the truth of her statement. *See Automobile Underwriters*, 53 N.E.2d at 778; *Medtech Corp. v. Indiana Ins. Co.*, 555 N.E.2d 844, 848 (Ind. Ct. App. 1990).

**Third**, the Controlling Sellers' attempts to use the integration clause of the SPA to bar claims for misrepresentations made prior to and outside of the SPA (*see* Sellers Br. at 18) also fail, because it is well established that only non-reliance clauses -- not simple integration clauses like SPA § 11.9 -- can bar claims based on pre-contractual representations. *See, e.g.*, *Am's Directories., Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059 (Ind. Ct. App. 2006); *Circle Ctr. Dev. Co. v. Y/G Ind., L.P.*, 762 N.E.2d 176, 178-80 (Ind. Ct. App. 2002); *Vigortone AG Prods. Inc. v. PM AG Prods., Inc.*, 316 F.3d 641, 644 (7th Cir. 2003).

**Fourth**, the Controlling Sellers' arguments that fraud claims can never be asserted by one commercial party against another where the two have dealt at arms length because reliance can never be established (Sellers Br. 15-16, 19), are wrong. KIK was entitled to rely on the Controlling Sellers' SPA representations about APG's finances because of their superior knowledge about APG, as well as because the SPA specifically contemplated and sanctioned reliance on the Controlling Sellers' representations -- "without independent investigation or verification" by KIK. (Compl., Ex. 1 at 5, Art. III (preamble).) At the time the financial misstatements were made, Sellers were in control of APG, a privately-held corporation, they lied and concealed from KIK interim financial statements, they supplied materially misstated financial statements, and they made misrepresentations so as to pressure KIK to complete due diligence in an expedited fashion and before audited financial statements for Old APG for FY2005 would be available. (Countercl. ¶¶ 39-44.) Given these circumstances, KIK plainly had the right to rely on the Controlling Sellers' misrepresentations and omissions respecting the

financial statements Bachman prepared, notwithstanding the fact that KIK performed its own due

diligence. *See Sriver v. Maley*, 151 N.E.2d 518, 521 (Ind. Ct. App. 1958) (holding that stock

buyer had right to rely on corporate president's financial representations even though buyer did

independent investigation).[17]

### 2. Each Of KIK's Fraud Claims Is Pled With Sufficient Particularity.

While the Controlling Sellers assert that KIK's 28-page counterclaim is so "complicated"

and "expansive" that it justifies an overlength brief in support of their motion to dismiss, they

simultaneously argue that the approximately 85 paragraphs spelling out KIK's allegations of

common-law fraud -- spanning approximately 17 pages and including, by Sellers' own count,

14 specific allegations of fraudulent misrepresentations and omissions -- do not plead fraudulent

with sufficient particularity to satisfy Rule 9(b) because KIK allegedly has engaged in

"impermissible group pleading" and "most of KIK's fraud allegations are improperly pleaded

---

[17] *See also SS&J Morris, Inc. v. Mahoney Cohen & Co.*, 264 A.D.2d 343, 343, 694 N.Y.S.2d 60, 61 (1st Dep't 1999) (justifiable reliance sufficiently alleged where defendants prevented plaintiffs from making independent investigation of company's books and records); *Lukowsky v. Shalit*, 110 A.D.2d 563, 568, 487 N.Y.S.2d 781, 785 (1st Dep't 1985) (reversing trial court dismissal for lack of justifiable reliance because underlying facts were disputed and could not properly be resolved on motion to dismiss); *Steinhardt Group, Inc. v. Citicorp*, 272 A.D.2d 255, 257, 708 N.Y.S.2d 91, 93 (1st Dep't 2000) (question of justifiable reliance for trier of fact and could not be resolved on motion to dismiss); *Rudolph v. Turecek*, 240 A.D.2d 935, 938, 658 N.Y.S.2d 769, 771 (1st Dep't 1997) ("[W]hether a party could have ascertained facts with reasonable diligence is a factual question for resolution by the jury."); *Bernstein v. Kelso & Co., Inc.*, 231 A.D.2d 314, 321, 659 N.Y.S.2d 276, 280 (1st Dep't 1997) (trial court erred in deciding factual issue of justifiable reliance on motion to dismiss). *Wisconics Eng'g Inc. v. Fisher*, 466 N.E.2d 745 (Ind. Ct. App. 1984), the primary authority relied upon by Sellers for their argument, is factually distinguishable from the instant case. In fact, the *Fisher* court, in *dicta*, indicates that reliance would be justified here. In *Fisher*, the court of appeals emphasizes that "the representations with which Fisher is charged are indefinite, imprecise, and general in nature. A representation that a business is 'doing a large and profitable business' does not state with specificity the amount of profit a business is making nor the volume of business from which that profit derives." *Id.* at 755-56. In holding that the buyers in that case did not have justification to rely on these allegedly fraudulent misrepresentations, the court concluded that the plaintiffs "most certainly possessed greater sophistication than their claim of reliance upon these ***vague representations*** would denote." *Id.* at 757 (emphasis added). The court then continued by distinguishing that case with a hypothetical situation, like the instant case, in which specific financial statements had been misstated. *Id.* at 757-58. Thus, *Fisher* in fact supports KIK's right to rely upon the financial statements that contained specific pleaded misstatements. *See also American United Life Ins. Co. v. Douglas*, 808 N.E.2d 690, 701 (Ind. Ct. App. 2004) (the "existence of a fiduciary relationship is not the only basis for a claim of fraud," even in the context of a buyer-seller arms length transaction).

based on 'information and belief' with no supporting facts for many of the alleged omissions." (Sellers Br. 10.)  Neither assertion is correct.

*First*, the Controlling Sellers do not -- because they cannot -- complain that the fundamental notice-giving purpose of Rule 9(b) has not been met here.  That is because KIK's fraud claims are addressed to the representations and omissions of three senior corporate executives of Old APG (the Controlling Sellers) over a two-month time period involving a discrete number of communications with a finite number of KIK personnel occurring on specified dates regarding specified topics.  (*See supra* part III.)  And, "[i]n the Seventh Circuit, a [counterclaimant] who provides a 'general outline of the fraud scheme' sufficient to 'reasonably notify the [counter-defendants] of their purported role' in the fraud satisfies Rule 9(b)." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 237 F.R.D. 173, 175 (N.D. Ill. 2006) (quoting *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)).

*Second*, the Controlling Sellers' assertions that KIK has engaged in impermissible "group pleading" (Sellers Br. 9-10), are erroneous.  In all but one instance, KIK's fraud claims allege that the "Sellers" -- meaning each of the Controlling Sellers, and not merely one or more of them -- made the misrepresentations at issue (either directly, or through Satish, their designated agent and representative, or through another agent) to KIK and/or omitted and/or concealed information from KIK that each had a contractual and/or common-law duty to disclose.  For example, alleging that each of the Controlling Sellers made the SPA representations at issue is proper, because each of these representations was expressly made by each of the Controlling Sellers and/or their agent, Satish.  These allegations do not suffer from the vice that "group pleading" proscriptions are addressed to -- namely, failing to distinguish among multiple and unrelated defendants and failing to identify who made what representations to whom. *See ,e.g.*,

*Interlease Aviation Investors II (Aloha) LLC v. Vanguard Airlines, Inc.*, 254 F. Supp. 2d 1028, 1038 (N.D. Ill. 2003) (allegations sufficient where they "notify each [counter-defendant] of the nature of his alleged participation in the fraud.").  *See also Morse v. Abbot Labs.*, 756 F. Supp. 1108, 1112 (N.D. Ill. 1991) (rejecting objections to group pleading because "in cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other 'group-published information,' it is reasonable to presume that these are the collective actions of the officers.") (citation omitted). Nor do the Controlling Sellers' "group pleading" arguments have any more merit with respect to KIK's securities fraud claims.[18]

**Third**, the Controlling Sellers' lastly argue that KIK improperly has not pled any supporting facts for the allegations it has made on information and belief.  They are wrong again.

---

[18]    *Makor* does not (as Controlling Sellers assert) outlaw the use of collective terms to refer to defendants, it simply requires that Rule 10b-5 claimants meet the threshold for inferring scienter with respect to each individual defendant, rather than relying on alleged misstatements in corporate publications to implicate its primary officers based solely on their positions within the corporation.  *See generally Makor*, 437 F.3d at 603-05.  The so-called "group-pleading presumption" described in *Makor* is not at work here, because it is unnecessary.  KIK does not need (or even ask) this Court to presume any actions occurred, or knowledge existed, based solely on the three individuals' status as Sellers, or former officers of APG.  The term "Sellers" is only employed by KIK in circumstances in which representations were made by, and/or knowledge can be attributed to, all three individuals based on specific factual allegations.  In other instances, the complaint alleges knowledge on the part of "Sellers" based on e-mail communications between or among the three individuals containing financial information that was not disclosed to KIK, but was obviously known to the sender and recipients.  (*See, e.g.*, Countercl. ¶¶ 32, 52, 56, 59.)  Even if the allegations that employ the term "Sellers" could be construed as "group-pleading" (and they cannot), there would be no need to employ a presumption, because the remaining allegations are more than sufficient to implicate the specific individuals.  KIK's counter-complaint refers to one or more of the individual sellers (Shah, Bachman and Theroux) by name in more than twenty paragraphs, and provides numerous specifics as to the time, place, and content of the communications or representations underlying the fraud claim.  (*See, e.g.*, Countercl. ¶¶ 24, 32, 47, 49-50, 52, 54, 56-57, 59, 64, 76-77, 98-99, 101-05).  These specific allegations are far more extensive than those in the other cases cited by counter-defendants.  *Contrast Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 & n.7 (7th Cir. 1998) (failing to specify "the time, place and content of any of the misrepresentations" with respect to certain defendants, and only referring to other defendants by name in three paragraphs); *Sears v. Likens*, 912 F.2d 889, 892 (7th Cir. 1990) (no details as to who made representations, or how or when they were made); *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 993 (W.D. Wis. 2003) (allowing claims to survive against three individuals specifically named in complaint, but dismissing claims against unnamed defendants).

For example, when alleging the Controlling Sellers' motives and knowledge (information exclusively within the possession of Controlling Sellers), such as in Countercl. ¶ 37 ("On information and belief, Sellers withheld and fraudulently concealed the existence of the Partial August Financials because they knew that their disclosure … would have resulted in a downward adjustment of the purchase price"), the preceding seven paragraph of the counterclaim (spanning two full pages) lay out in clear detail the factual basis for that belief -- namely that Sellers, by both affirmative misrepresentation and failure to disclose, led KIK to believe that the initial financial statements contained the most current projections available when in fact each was in the possession of more up-to-date financial statements, albeit less rosy ones. (*See* Countercl. ¶¶ 30-36; *compare* Countercl. ¶¶ 41-44, *with* Countercl. ¶¶ 42, 43; *compare* Countercl. ¶ 76, *with* Countercl. 54, 77-82; *compare* Countercl. ¶¶ 93-94, *with* Countercl. ¶¶ 13, 16-17, 86-91.)

**B.      KIK's Rule 10b-5 Claims Should Not Be Dismissed.**

The Controlling Sellers' arguments for dismissal of KIK's Rule 10b-5 counterclaims are equally meritless.

*First*, the Controlling Sellers' assertions that KIK has insufficiently alleged facts supporting a strong inference of scienter as to each of the Sellers are wrong.

To establish scienter, "[a] company's overstatement of earnings or revenues combined with other circumstantial evidence can suggest fraudulent intent sufficient to support a strong inference of scienter." *In re Anicom Inc. Sec. Litig.*, No. 00 C 4391, 2001 WL 536066, at *5 (N.D. Ill. May 18, 2001); *see also Chu.*, 100 F. Supp. 2d at 824. Notably the PSLRA does not require the pleading of evidence. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("Even with the heightened pleading standard under Rule 9(b) and the [PSLRA] we do not require the pleading of detailed evidentiary matter in securities litigation."); *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1101 (10th Cir. 2003) ("The PSLRA did not … purport to

move up the trial to the pleadings stage."). And, as noted above, the sufficiency of KIK's allegations is assessed by reference to the collective allegations of KIK's counterclaims, not by reference to allegations in isolation. *See Makor,* 437 F.3d at 601; *Chu v. Sabratek Corp.*, 100 F.Supp.2d 815, 823 (N.D.Ill.2000) ("The *types* of facts with which a plaintiff pleads scienter factor little into our analysis, as long [as] the overall facts give rise to [  ] 'a strong inference' of scienter.").

The Controlling Sellers first contend that KIK has failed to allege motive and opportunity to commit fraud. (Sellers Br. 24.) But in *Makor*, the Seventh Circuit made clear that motive and opportunity are "useful indicators" for inferring scienter, but are neither "necessary or sufficient" to plead fraud under the PSLRA.[19] 437 F.3d at 601. Rather, they should be taken into account along with all of the allegations in the complaint in determining "whether collectively they establish such an inference" of scienter. *Id.*

Motive and opportunity are less relevant here, at least with respect to certain claims, because KIK specifically alleges that the Controlling Sellers had knowledge of certain undisclosed information based on documented communications between them. (*See* Countercl. ¶¶ 32, 52, 56, 59.) Nevertheless, KIK's allegations in this case also strongly support a motive-and-opportunity inference that the Controlling Sellers intended to defraud KIK. The crux of KIK's allegations is that the Controlling Sellers -- through fraudulent means, misrepresentations, and omissions -- were motivated not merely to inflate their company's stock price, but to obtain an illegally inflated purchase price for APG. (Countercl. ¶¶ 25, 111, 113, 114-118.)

---

[19] "Motive" entails "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Rehm v. Eagle Fin, Corp.*, 954 F. Supp. 1246, 1253 (N.D. Ill. 1997) (citing *Shields v. Citytrust Bancorp. Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994)).

While the Controlling Sellers assert that their only motive was the competitive drive of self-interested, law-abiding corporate officers in maximizing company revenues (Sellers Br. 24),[20] KIK has alleged a motive on the part of Sellers to fraudulently and maliciously misrepresent the earnings of Old APG to an identified buyer, and thereby concretely inflate the purchase price that each of the Controlling Sellers received for his shares of the Old APG. (Countercl. ¶¶ 37, 44, 98.) Moreover, KIK has not only alleged such a motive, but has detailed the motivating benefits in concrete dollar figures. (*Id.* ¶¶ 70-74, 85, 93-95, 97, 113, 118, 124.) This is far more probative of scienter than the simple generic profit motive of the average officer.

The Controlling Sellers next argue that KIK has failed to allege sufficient circumstantial evidence of fraud to infer scienter. (*See* Sellers Br. 25.) As stated above, however, KIK does not need to rely on circumstantial evidence to infer scienter here because it already has alleged sufficient motive and opportunity evidence.

Controlling Sellers further argue that KIK is alleging "fraud by hindsight" by claiming that certain "matters which came to light later" should have been disclosed by Sellers prior to the sale of APG. (Mot. at 26) The Controlling Sellers provide no support for this argument other than a string of inapposite, boilerplate case citations, and the facts supporting scienter that KIK has alleged here easily distinguish this case from those cited by the Controlling Sellers.

The Controlling Sellers also argue that KIK makes "allegations of corporate mismanagement" that cannot be actionable in relation to the distribution center project (Sellers Br. 25), but the Seventh Circuit has declined to adopt such a per se rule. *Sakhrani v. Brightpoint,*

---

[20] KIK's allegations go far beyond those discussed in the inapposite cases cited by the Controlling Sellers, such as *Stavros v. Exelon Corp.*, 266 F.Supp.2d 833, 848 (N.D. Ill. 2003) (only motive alleged was that defendants sought to maximize earning potential on corporate debt offerings and executive compensation), and *Sakhrani v. Brightpoint, Inc.*, No. IP99-0870-C-H/G, 2001 WL 395752, at *13 (S.D. Ind. March 29, 2001) (only motive alleged was desire to increase incentive compensation based on position within company).

*Inc.,* No. IP99-0870-C-H/G, 2001 WL 395752, at *19 (S.D. Ind. Mar. 29, 2001) and other cases cited by the Controlling Sellers involve forward-looking statements and press releases that are clearly distinguishable from Controlling Sellers' misstatements and omissions regarding the distribution center project, which violated numerous specific representations and warranties in the SPA, some of which were specifically tailored to require disclosure of potential cost overruns on the project. (*See* Countercl. ¶¶ 88-95.)

Finally, the Controlling Sellers argue that GAAP violations are insufficient to infer scienter. But KIK has alleged numerous fraudulent acts and omissions that did not involve GAAP violations. Moreover, violations of GAAP may be relevant to the scienter analysis, especially where, as here, the violations are egregious and involve simple accounting principles that involve little or no subjectivity and are not the only misrepresentations. *See PR Diamonds Inc. v. Chandler*, 364 F.3d 671, 684-85 (6th Cir. 2004); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 636 (E.D.Va. 2000).

While some accounting matters require significant discretion, others, such as revenue recognition violations like those at issue here, are generally less complex with less room for error. For example, prematurely recognizing revenues is a GAAP violation that is so obvious that it clearly supports an inference of scienter. *See In re Gilat Satellite Networks. Ltd.*, No. CV-02-1510, 2005 WL 2277476, at *20 (E.D.N.Y. Sept. 19, 2005). Thus, backdating sales and accelerating receivables are obvious GAAP violations that are probative of an intent to defraud. (*See, e.g.*, Compl., Ex. 3 ¶¶ 88-92.) Finally, a high number of accounting errors also strengthens the inference of a defendant's scienter. *Microstrategy*, 115 F. Supp. 2d at 634-35; *In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1023, 1031 (N.D. Ohio 2000) . KIK has alleged numerous GAAP violations on the part of the Controlling Sellers in connection with the

unaudited financial statements that were appended to the SPA (Countercl. ¶¶ 69, 71, 72), therefore, the sheer number of accounting errors further supports a finding of scienter -- especially when, as here, adherence to GAAP has been represented and warranted by the fraudfeasor.

*Second*, the Controlling Sellers next devote only a few sentences to the specific issue of whether KIK has adequately pled scienter with respect to each of them.  Because the "group pleading" assertions on which these arguments are based are without merit, however, they do not establish any deficiency in KIK's allegations.  Moreover, KIK's allegations with respect to Satish, Theroux, and Bachman, are more than sufficient to infer scienter as to each of them.  Indeed, KIK's counterclaims refer to each of these three individuals by name in more than twenty paragraphs, and they provide numerous specifics as to the time, place, and content of their fraudulent representations and omissions.  (*See, e.g.*, Countercl. ¶¶ 24, 32, 47, 49-50, 52, 54, 56-57, 59, 64, 76-77, 98-99, 101-05.)  In addition, allegations involving "Sellers" should be applied to all three individuals and the SSRT based on alleged factual predicates, rather than presumptions derived from their roles in the company.

*Third*, in assessing whether KIK has pled with particularity the false or misleading nature of the Controlling Seller's statements or omissions, "the relevant question is whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement[s] or omission[s]."  *Makor*, 437 F.3d at 595 (citations and quotations omitted).  As set forth above, KIK has alleged with particularity the specific misleading statements and omissions at issue here.  In *Takara Trust v. Molex, Inc.*, the court found comparable allegations to be sufficiently particularized to establish a "reasonable belief" as required by the PSLRA.

429 F. Supp. 2d 960, 975 (N.D. Ill. 2006) (finding allegations regarding manipulation of financial statements sufficient to state a claim under the PSLRA).

*Fourth*, contrary to the Controlling Sellers' assertions, KIK's allegations regarding loss causation exceed the standard under both Seventh Circuit case law and the recent Supreme Court decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005).

"To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Caremark, Inc. v. Coram Healthcare Corp.*, 113 F.3d 645, 648 (7th Cir. 1997). As the Supreme Court noted in *Dura Pharmaceuticals*, "the Federal Rules of Civil Procedure require only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" 544 U.S. at 346. This "short and plain statement" need only provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id* (citation omitted). In other words, neither the federal rules nor the securities statutes alter the pleading requirements for proximate causation and economic loss, which remain governed by Rule 8. *See* Fed. R. Civ. P. 8; *Caremark*, 113 F.3d at 649. KIK's counterclaims in this case clearly satisfy this basic standard.

While the Controlling Sellers argue that KIK has failed to identify the loss it suffered, and in fact cannot identify such a loss because the Net Working Capital Adjustment procedure remains ongoing (Sellers Br. 31), this argument wrongly implies that KIK is required to allege its precise loss before trial or even discovery -- precisely the sort of "unrealistic burden" that the Seventh Circuit rejected in *Caremark*, and one far exceeding the notice pleading standard of Rule 8. Damages are an issue for trial and not a threshold pleading requirement. *See Moffett v. Gene B. Glick Co., Inc.,* 604 F.Supp. 229 (D. Ind. 1984). For the purpose of pleading fraud, it is

enough that KIK has identified its losses as the amounts of the respective adjustments to the purchase price. (Countercl. ¶¶ 73, 82, 84, 96, 111, 113, 129.)

Further, contrary to the Controlling Sellers' assertions, KIK has adequately connected the losses it seeks to recover to the Controlling Sellers' misrepresentations and omissions. The basis for KIK's causation argument is not merely that APG's stock was overvalued. Rather, KIK repeatedly connects the misstatements and omissions by the Sellers to KIK's failure to demand a reduction in the purchase price (based on the Febreze precedent) or indemnification from Sellers for certain future costs and liabilities. (*See, e.g.*, Answer and Countercl. at ¶¶ 73, 82, 84, 96, 111, 113, 129) Rule 8 does not require KIK to plead the exact amounts of these losses (although KIK does so in many places), it merely requires KIK to identify these losses in a "short and plain statement" to put counter-defendants on "fair notice" of the claims against them. *Dura*, 544 U.S. at 346. KIK has more than met that burden here.

### C. KIK's ICVRA Claims Should Not Be Dismissed.

The Controlling Sellers assert that "KIK's criminal mischief/deception counterclaims fail as a matter of law because they rest on … KIK's common law fraud claims." (Sellers Br. 20.)

KIK's ICVRA claim does not rest on KIK's claim that the Controlling Sellers committed common law fraud, but rather on the assertion that the Controlling Sellers committed "criminal mischief" and "deception." (*See* Countercl. ¶¶ 115-24.) The term "deception" in Indiana's criminal code is legally distinct from common-law fraud, and arguments premised on common-law fraud requirements such as reliance are unavailing with respect to criminal deception. *See Streeval v. State*, 241 N.E.2d 255, 260 (Ind. 1968); *accord Carrell v. George Weston Bakeries Distribution, Inc.*, No. 1:05-CV-01769-SEBJPG, 2006 WL 1005041, at *3 (S.D. Ind. April 13,

2006) (noting that "[p]roof of reliance is not required to sustain a conviction under [the criminal deception] statute" in denying a motion to dismiss civil claims based on the statute).[21]

### D. KIK's Declaratory Judgment Claims Should Not Be Dismissed.

KIK's declaratory judgment counterclaims against Controlling Sellers and former employees Bachman and Theroux (the "Employees") are sufficient as pled. The Employees wrongly attempt to import common-law definitions of the contractual term "successor-in-interest," when in fact the relevant contracts themselves specifically and unambiguously define such a "successor-in-interest" to include KIK. (*See* Sellers Br., Ex. 9, at ¶ 17; *id.*, Ex. 10, at ¶ 17.) Parties to a contract are free to define the rights and obligations under that contract as they see fit. *Rothe v. Revco D.S., Inc.*, 148 F.3d 672, 675 (7th Cir. 1998) (applying Indiana law). Thus, the term "successor-in-interest" in the employment agreements must be construed, as a matter of contract interpretation, according to its contractually-agreed meaning, notwithstanding some court decisions from other jurisdictions interpreting the meaning of the term in other contexts.[22]

---

[21] The legal authorities cited by the Controlling Sellers -- *F. McConnell & Sons, Inc. v. Target Data Sys., Inc.*, 84 F. Supp. 2d 980 (N.D. Ind. 2000) and *SMC Corp. v. PeopleSoft USA Inc.*, No. 1:00-CV-01095-LJM-VS, 2004 WL 253861 (S.D. Ind. Oct. 12, 2004) -- also do not support their assertion that any deficiencies with KIK's common law fraud claims also infect its ICVRA claims. **First**, both cited cases are inapposite. In *Target*, the counterclaims before the court referred to the "***fraudulent*** misrepresentations and omissions" of the counter-defendants. 84 F. Supp. 2d at 987 (emphasis added). Because the defendant had, in its own pleadings, thus made its criminal claims dependent on its allegation of fraud, the court disregarded the defendant's argument that "fraud is not a required element of any of the criminal statutes upon which it relies" because "[a]s the drafter of the claim, defendant is the master of its pleading, and as such can plead itself out of court by pleading assertions which undermine its claim." *Id.* (internal citations omitted). Because KIK has not similarly tied its ICVRA claims to its allegations of fraud, the reasoning of *Target* is inapplicable here. **Second,** in *SMC*, the court considers the possibility that the deception statute is not substantively identical to common-law fraud, but it appears that the only argument presented by the plaintiff in that case is that the deception statute contains an additional element -- a writing. *See* 2004 WL 2538641, at *6. The court does not indicate that it considered the holding of the Indiana Supreme Court that certain elements of common-law fraud -- namely reliance -- are not required for criminal deception. *See id.* As a result, *SMC* is not even persuasive authority in this case.

[22] The Employees irrelevantly argue that a contract is to be construed against the party who drafted it. Not only is there no mention in KIK's counterclaims as to who drafted the employment agreements in question, but the

(Continued…)

Moreover, even if the Employees' reading of the relevant contracts were reasonable, that would merely establish that those contracts are ambiguous on this point (as KIK's reading is at least equally reasonable), and such an ambiguity cannot be resolved against KIK pursuant to Rule 12(b)(6). *See Dawson v. Gen'l Motors Corp.*, 977 F.2d 369, 373 (7th Cir. 1992).

Further, even if the Employees' assignment arguments had merit, KIK has alleged that both of the Employees waived any objection to the assignment by failing to object to the same after KIK invited them to advise it of any objections that the Employees had to their terminations prior to those terminations. (*See* Countercl. ¶¶ 132, 145; Amended Countercl. ¶¶ 173, 188.) At the very least, such waiver issues again raise matters of fact that cannot be decided against KIK at this juncture pursuant to Rule 12(b)(6). *See Page Two, Inc. v. P.C. Mgt, Inc.*, 517 N.E.2d 103, 106 n.1 (Ind. Ct. App. 1987).

Employees specifically agreed in their agreements that this rule of construction was not applicable. (*See* Sellers Br., Ex. 9 ¶ 19(d); *id.*, Ex. 10 ¶ 19(d).)

34

## V.    CONCLUSION

For all of the foregoing reasons, the Controlling Sellers' motion to dismiss should be denied.  Should, however, KIK's pled claims be technically defective in any respect, then KIK respectfully requests that the Court grant it leave to re-plead its counterclaims to correct any such perceived deficiency.[23]

Dated:  January 19, 2007                              Respectfully submitted,

                                                      KIK INTERNATIONAL LLC


                                        By:     /s/ Drew G. A. Peel
                                                _____
                                                One of its attorneys

---

[23] In the last sentence of their Conclusion, and as an alternative to dismissal of KIK's counterclaims, Controlling Sellers invite this Court to stay KIK's counterclaims pending the outcome of the Net Working Capital Adjustment.  (Sellers Br. 34.)  Inasmuch as Controlling Sellers have not sufficiently moved for such relief by providing any factual or legal support whatsoever in support of such a motion (neither within their Brief nor in any of their pleadings to date), this Court should not even entertain Controlling Sellers' request.  To the extent that this Court is inclined to consider such relief, KIK requests an opportunity to fully brief this issue before any ruling on a stay of KIK's counterclaims is made.

## CERTIFICATE OF SERVICE

I, Drew G. A. Peel, hereby certify that a copy of *KIK'S Brief in Opposition to Counterclaim Defendants' Motion to Dismiss* was served upon the following attorneys of record by filing through the Northern District of Indiana's CM/ECF system on the 19th day of January 2007.

Timothy J. Abeska
tim.abeska@btlaw.com
Robert G. Devetski
robert.devetski@btlaw.com
Kelly J. Hartzler
kelly.hartzler@btlaw.com
Barnes & Thornburg LLP
600 1st Source Bank Center
100 N. Michigan Street
South Bend, Indiana 46601

**KIRKLAND & ELLIS LLP**


By:         /s/ Drew G. A. Peel
              One of its attorneys